**In re Daniel B. ZALEHA, Debtor.**

**Bankruptcy No. 93–00638–11.**

United States Bankruptcy Court,
D. Idaho.

Aug. 31, 1993.

Bob E. Pangburn, Caldwell, ID, for debtor.

Jeffrey M. Wilson, Wilson, Carnahan & McColl, Boise, ID, for Toyota Motor Credit Corp.

### MEMORANDUM OF DECISION

ALFRED C. HAGAN, Chief Judge.

Toyota Motor Credit Corporation ("TMCC") moves, under 11 U.S.C. § 365, to require Daniel Zaleha, the debtor in this chapter 11 case ("debtor"), to assume or reject an unexpired lease. The debtor defends on the ground the transaction is not

a true lease, but is in fact a disguised security interest.

The lease at issue is for a 1991 Toyota 4WD Deluxe ExtraCab Pickup. The lease has a term of five years, and calls for 60 monthly payments of $323.82. The debtor could become owner of the vehicle at the end of the lease term for $5,390.00, which the lease defines as both the "Purchase Option Price" and the "Estimated Residual Value." The debtor contends this amount undervalues the vehicle. The debtor presented copies of the current Blue Book, which indicates a five-year old Toyota pickup with comparable options and mileage has an average retail value of $8,275.00. Based on this, debtor argues the vehicle will have an expected value at lease termination of at least $8,275.00.[1]

The determination of whether a transaction is a true lease or a disguised security interest is determined by state law. *Arnold Machinery Co. v. Trustee Services Corp. (In re Hodge Lumber & Wholesale, Inc.)*, 86 I.B.C.R. 28, 28–29 (Bankr.D.Idaho 1986). Traditionally, this court has relied upon a list of seven factors in determining whether a transaction is a true lease or a disguised sale. These are:

1. Whether the option price is nominal;
2. Whether the lessee obtains equity in the property leased;
3. Whether the lessee bears the risk of loss;
4. Whether the lessee pays the tax, licensing and registration fee;
5. Whether the lessor may accelerate payment;
6. Whether the property is purchased specifically for lease to the lessee; and
7. Whether the lease contains a disclaimer of warranties.

*In re Maritt*, 155 B.R. 12, 13 (Bankr.D.Idaho 1993). This list of factors was based upon interpretation of Idaho Code § 28–1–201(37). *See Arnold, supra*, 86 I.B.C.R. at 29. However, the Idaho Legislature has recently amended section 28–1–201(37) to include a much more detailed discussion of whether a transaction is a lease or a sale. Thus, the express language of the statute in determining the status of the lease agreement at issue here must first be considered.

Section 28–1–201(37) of the Idaho Code defines the term "security interest." As amended, the statute discusses the differences between a lease and a disguised sale as follows:

Whether a transaction creates a lease or security interest is determined by the facts of each case; however, a transaction creates a security interest if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee, and:

(a) the original term of the lease is equal to or greater than the remaining economic life of the goods; or

(b) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods; or

(c) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement; or

(d) the lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

A transaction does not create a security interest merely because it provides that:

(a) the present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or is

---

**1.** Debtor presented an additional method of computing the value of the vehicle as of termination of the lease, based upon the annual depreciation of Toyota pickups with similar options. The resulting figure ($8,388.33) was comparable to that obtained by simply looking at today's value of a five-year old Toyota vehicle with similar options ($8,275.00).

greater than the fair market value of the goods at the time the lease is entered into; or

(b) the lessee assumes risk of loss of the goods, or agrees to pay taxes, insurance, filing, recording, or registration fees, or service or maintenance costs with respect to the goods; or

(c) the lessee has an option to renew the lease or to become the owner of the goods; or

(d) the lessee has an option to renew the lease for a fixed rent that is equal to or greater than the reasonably predictable fair market rent for the use of the goods for the term of the renewal at the time the option is to be performed; or

(e) the lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value of the goods at the time the option is to be performed.

For the purposes of this subsection (37):

Additional consideration is not nominal if (i) when the option to renew the lease is granted to the lessee the rent is stated to be the fair market rent for the use of the goods for the term of the renewal determined at the time the option is to be performed, or (ii) when the option to become the owner of the goods is granted to the lessee the price is stated to be the fair market value of the goods determined at the time the option is to be performed. Additional consideration is nominal if it is less than the lessee's reasonably predictable cost of performing under the lease agreement if the option is not exercised.

"Reasonably predictable" and "remaining economic life of the goods" are determined with reference to the facts and circumstances at the time the transaction is entered into.

"Present value" means the amount as of a date certain of one (1) or more sums payable in the future, discounted to the date certain. The discount is determined by the interest rate specified by the parties if the rate is not manifestly unreasonable at the time the transaction is entered into; otherwise, the discount is determined by a commercially reasonable rate that takes into account the facts and circumstances of each case at the time the transaction was entered into.

I.C. § 28–1–201(37) (as amended by 1993 Idaho Sess.Laws ch. 287, § 3).[2] This amendment became effective on July 1, 1993. *See* I.C. § 67–510 (with certain exceptions, enactments of Idaho Legislature become effective on July 1 of the year of the regular session). No reported Idaho cases have considered the interpretation of this section.

This statute consists of several different standards to be used in the lease/security interest issue. The proper manner in which these tests are to be applied was set forth in *In re Lerch,* 147 B.R. 455 (Bankr. C.D.Ill.1992) interpreting the same statute:

The initial portion of the first sentence of the second unnumbered paragraph contains the basic direction that the determination is made based on the facts of each case. The latter portion of the first sentence of the second unnumbered paragraph starting with the word "however" creates an exception to the basic direction that the determination is made on the facts of each case, as it provides that without looking at all the facts, a lease will be construed as a security interest if a debtor cannot terminate the lease, and if one of the four enumerated terms is present in the lease.

---

**2.** This quote omits the language of the first paragraph of I.C. § 28–1–207(37), which is not directly relevant to the discussion here. The paragraphs of subsection (37) are not numbered, as can be seen in the portion quoted above. In order create uniformity in the manner in which references are made to the different paragraphs, the paragraphs shall be referred to by number, counting the first, unquoted paragraph. Thus, the paragraph beginning "Whether a transaction creates a lease or security interest" shall be referred to as the second paragraph; the paragraph beginning "A transaction does not create a security interest" shall be referred to as the third paragraph; etc.

Absent a mandated classification, the determination is based on the facts of the case. At this point the third unnumbered paragraph comes into effect. Focusing on the economics of the transaction, it states that a security interest is not created merely because it contains any of the five terms enumerated in the third unnumbered paragraph.

147 B.R. at 460.

■ It must first be determined whether the transaction in this case falls within the mandated definition of security interest set forth in the second paragraph of section 28–1–201(37). The first element of the test is that the lessee must be obligated to perform for the full length of the lease, without being able to voluntarily terminate the lease. That condition is met here. Lease Agreement, ¶ 20. Second, one of four conditions must also be met. The fourth, subsection (d), is the only one of the four possibly applicable here; namely, whether "the lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement." The consideration required to exercise the option in this instance is not nominal. Accordingly, the transaction does not meet the *mandatory* conditions under which it is deemed a disguised security interest.

The nature of this transaction must therefore be determined on the facts of the case. The manner, however, in which section 28–1–201(37) has been amended indicates the prior seven-point test must be reconsidered. Factors previously relied upon by this Court in determining whether a transaction is in fact a disguised security interest include, as noted previously, whether the lessee bears the risk of loss (factor 3), and whether the lessee pays tax, licensing, and registration fees (factor 4). Subsection (b) of the third paragraph of amended section 28–1–201(37) states that none of these facts of necessity creates a security interest. I.C. § 28–1–201(37)[¶ 3](b). In addition, the seventh factor of the prior test of a disguised security interest was a disclaimer of warran-

ties. At the same time that section 28–1–201(37) was amended, the Idaho Legislature adopted Article 2A of the Uniform Commercial Code, governing leases. The new provisions specifically contemplate that a lease of personal property may include disclaimers of warranties. I.C. § 28–12–214.

These inconsistencies reflect the fact that

courts have relied upon factors that were thought to be more consistent with sales or loans then [sic] leases. Most of these criteria, however, are as applicable to true leases as to security interests. Examples include the typical net lease provisions, a purported lessor's lack of storage facilities or its character as a financing party rather than a dealer in goods.

U.C.C. § 1–201(37) official comment (1987 amendment).

It makes sense that a lessee would provide insurance on the property while in possession of it under a lease; it seems perfectly reasonable for a lessee to agree to undertake some of the risks of loss or damage while the lessee enjoys possession and use of the property. The same holds true for taxes and maintenance.

*Basic Leasing, Inc. v. Paccar, Inc.*, 1991 WL 117412, at *4 (D.N.J.1991). "Costs such as taxes, insurance and repairs are necessarily borne by one party or the other. They reflect less the true character of the transaction than the strength of the parties' respective bargaining positions." *In re Marhoefer Packing Co., Inc.*, 674 F.2d 1139, 1146 (7th Cir.1982).

The key distinction between a lease and a security interest is suggested by the tests set out in the second paragraph of section 28–1–201(37).

In each situation where a security interest is deemed to exist under [the second paragraph], the "lessor" cannot reasonably expect to receive back anything of value at the end of the lease. Either the goods will have reached the end of their economic life or the "lessee" will be compelled, contractually or economically, to purchase the goods or renew the "lease"

to the end of the economic life of the goods. Commentators have labelled this key factor distinguishing a lease from a security interest as the lessor's retention of a "meaningful residual interest."

*Woodson v. Ford Motor Credit Corp. (In re Cole)*, 100 B.R. 561, 564 (Bankr.N.D.Okl. 1989), *aff'd*, 114 B.R. 278 (N.D.Okl.1990) (footnote omitted).

By placing more emphasis upon what happens at the termination of the original lease, the drafters of Article 2A have attempted to reestablish the significance of residual value as an economic rationale for a lease transaction, the argument being that absent a concern for the value or expectant return of the goods upon the conclusion of the lease term the lessor, at the inception of the lease, had really formulated no further anticipation of an investment return from the leased goods, an anticipation more historically associated with an intent to transfer a title interest in the goods (with lease terms designed to protect against the failure of that intent). Hence, the need for some form of security.

Gregory J. Naples, "A Review and Analysis of the New Article 2A–Leases Amendment to the UCC and its Impact on Secured Creditors, Equipment and Finance Lessors," 93 Comm.L.J. 342, 350 (Fall 1988).

It is important to note that the term "meaningful residual interest" refers to more than just a legal reversionary interest retained by a lessor. As suggested above, the term looks to the value retained by the leased goods after completion of the transaction. *See* Corinne Cooper, "Identifying a Personal Property Lease Under the UCC," 49 Ohio St.L.J. 195, 204 n. 31 (1988).

The notion that the key aspect of a true lease is whether the lessor retains a meaningful residual interest is not new. If a lease contains an option to purchase for no or nominal consideration (factor 1 of the seven-point test), it suggests that the lessor does not care, in an economic sense, whether or not the option is exercised. If the lessee develops equity in the leased property such that the only sensible decision economically for the lessee is to exercise the option (factor 2 of the test, also known as the "economic realities" test), it suggests the lessor did not expect the return of the leased goods. As a result, these two factors, in contrast to the others, have been recognized as the more important in determining the lease/security interest distinction. *Arnold Machinery, supra*, 86 I.B.C.R. at 29. *See also Eimco Corp. v. Sims*, 100 Idaho 390, 598 P.2d 538, 541–42 (Idaho 1979) ("equity in the lessee is one of the distinctive characteristics of a lease intended for security").

Because the seven-factor test incorporated the consideration of whether a lessor retains a meaningful residual interest, prior precedent remains helpful in establishing circumstances under which a lessor retains such an interest. However, the seven factors previously used by this Court are both inadequate and contrary to the language of section 28–1–201(37). The seven-factor test also distracts from consideration of the true issue, that is, whether at the time of contracting the lessor retained a meaningful residual interest. It is accordingly held that, where a transaction must be evaluated on its facts because the mandatory elements of the second paragraph of section 28–1–201(37) are not met, the proper standard of evaluation is whether the transaction left the lessor with a meaningful residual interest in the leased property. This incorporates consideration of whether the lessee develops equity in the leased goods, without distracting from other elements of the transaction that may also bear on the central issue of whether the transaction is a true lease.

Debtor argues that he has accumulated equity in the truck. As already discussed, debtor has presented evidence to show the truck will have an average retail value on termination of the lease of at least $8,275.00, while he may purchase the vehicle at that time for $5,390.00. This represents an accumulation of $2,885.00 in what may be termed equity, or 54% of the option price.

■ Debtor's evidence addresses only the value of the truck as calculated from

the present date, nearly 2½ years after the option price was set. This is not the proper point to determine whether the option price was set low in order to force the debtor to buy the truck. As the Seventh Circuit held under the prior version of U.C.C. § 1–201(37), "in determining whether an option price is nominal, the proper figure to compare it with is not the actual fair market value of the leased goods at the time the option arises, but their fair market value at that time as anticipated by the parties when the lease is signed." *Marhoefer, supra,* 674 F.2d at 1144–45. In *Marhoefer,* for example, high inflation rates over the term of the lease had resulted in an option price significantly less than the actual fair market value at the time the option would have been exercised.

Commentators support the conclusion that the date of the transaction, rather than a future date, is the more appropriate point to determine the adequacy of the option price. White and Summers reach such a conclusion in their discussion of the "economic realities" test.

> Intending a true lease, parties might at the outset select an option price that they believe will equal the fair market value of the property at the end of the lease. The value may be substantially higher or lower than their estimate when the lease ends. If the option were "nominal" at the conclusion of the lease (because the property had not depreciated as expected), but would have been equal to the fair price had the parties' estimate proved true, should the agreement be termed a lease or a security interest? We believe it should be termed a lease.
>
> Parties make the agreement at the outset. It is only there that they have the common intention to create a lease or security agreement, and it is at that time we should measure the economic realities to determine their true intention. If subsequent events make the option price "nominal" at the end of the lease, so be it. That fact does not change what was once a true lease into a security agreement. The courts have not always been careful to distinguish between the pre-

dicted value established at the outset and the actual value to determine the economic realities; our view is supported by the newly proposed uniform law on leasing [U.C.C. Article 2A and the amendments to section 1–201(37)].

James J. White & Robert S. Summers, Uniform Commercial Code § 21–3, at 934 (3d ed. 1988) (footnote omitted). "Any other timing for this evaluation permits a lease which was believed by the parties at its inception to be a true lease, to be 'transubstantiated' into a security interest if the residual turns out to be more valuable than the parties anticipated at the inception of the transaction." Cooper, *supra,* 49 Ohio St.L.J. at 212 n. 58.

■ In applying these standards to the present case, labels used by the parties are not determinative of the situation. However, where the transaction is denominated a lease, the burden is upon the debtor to demonstrate that the transaction is in fact a disguised security interest rather than a true lease. The debtor has not carried that burden here. The agreement here is denominated a lease, and contains provisions entirely consistent with the terms of a true lease. No evidence has been presented to show that the "Estimated Residual Value" was not a reasonable estimate, at the time the contract was signed, of the truck's value after five years of use. The agreement limits the number of miles that the truck may be driven in a year, and imposes a penalty of ten cents per mile if that limit is exceeded, suggesting that TMCC wishes to preserve the residual value of the truck. Lease Agreement, ¶ 11. There is no indication that TMCC, as lessor, had effectively bargained away to the debtor the residual economic value of the truck on termination of the lease.

A separate order will be entered.