W.H. PAIGE & CO., Petitioner,

v.

STATE BOARD OF TAX COMMISSIONERS, Respondent.

No. 49T10–9611–TA–00157.

Tax Court of Indiana.

June 22, 1999.

B. Keith Shake, Kerry L. Wagner, Henderson Daily Withrow & DeVoe, Indianapolis, Indiana, Attorneys for Petitioner.

Jeffrey A. Modisett, Attorney General of Indiana, Vincent S. Mirkov, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Respondent.

FISHER, J.

W.H. Paige (Paige) appeals a final determination of the State Board of Tax Commissioners (State Board) assessing Paige on the March 1, 1995 assessment date for personal property tax on musical instruments Paige leased to its customers pursuant to rent-to-own agreements.

## FACTS AND PROCEDURAL HISTORY

The facts of this case are not in dispute. Paige is engaged in the business of selling and leasing musical instruments. When leasing musical instruments, Paige uses two types of form leasing contracts. One of these form contracts is used to lease musical instruments under Paige's "Rent–to–Rent Program." The assessment of musical instruments under Paige's "Rent–to–Rent Pro-

gram" is not at issue in this case. The second form lease contract [hereinafter referred to as rent-to-own lease] is used to lease musical instruments under Paige's "Monthly Rent–to–Own Program." The assessment of these musical instruments is at issue in this case.

The rent-to-own lease contains two consecutive terms. The first term is a trial rental period, during which the customer (lessee) must lease the musical instrument and make monthly rental payments. (The trial rental period usually lasts for two months; however, it may be extended in exchange for lower monthly payments.) During the trial rental period, the lessee may purchase the musical instrument for the listed purchase price minus any rental payments made during the trial rental period. After the trial rental period, the lessee may do one of three things: 1) return the musical instrument with no further obligation, 2) purchase the musical instrument outright and receive a credit for rental payments made during the trial rental period, or 3) enter into the second lease term, a month-to-month renewable lease with an early purchase option feature. The second lease term provides for a fixed number of monthly payments after which the lessee may exercise an option to purchase the musical instrument for a small payment. In addition, during the second lease term, the lessee may exercise the early purchase option by tendering payment of the listed purchase price of the musical instrument minus the trial period rental payment and 70% of the monthly rental payments received by the date of purchase. The rent-to-own lease also allows the lessee to return the musical instrument at any time during the second lease term and incur no further obligation. During both lease terms, Paige retains title to the musical instrument until the lessee pays the amounts necessary for the lessee to become the owner of the musical instrument.

Some samples of actual rent-to-own lease agreements were attached to the affidavit of Mr. Garry L. Seidner that Paige designated as evidence in support of its summary judgment motion. In one of those lease agreements, the customer leased a new Bach Trumpet. The Bach Trumpet had a retail price at the time of the agreement of $595.00. The customer was obligated for a two-month trial rental period for which he was to pay $58.70 at the time of entering the lease agreement. After the trial rental period, the customer could enter a month-to-month renewable lease by making the first monthly rental payment of $28.35. If the customer renewed the lease for thirty consecutive months, the customer could purchase the Bach Trumpet for $14.73. This payment is 7.67% of the fair market value ($192.00) of the Bach Trumpet at the end of the thirty-month term.[1]

On March 1, 1995, a State Board field auditor recommended to the State Board that Paige be assessed for personal property tax for the instruments that Paige rents to its customers pursuant to the "Monthly Rent–to–Own Program." Paige timely filed an objection to the field auditor's recommended assessment, and on August 27, 1996, the State Board held a hearing on Paige's objection. On September 27, 1996, the State Board issued its final determination. In that final determination, the State Board concluded that Paige was liable for personal property tax on the musical instruments and that Paige was also liable for undervaluation penalties and for failure to file required personal property tax returns. *See* IND.CODE ANN. § 6–1.1–37–7 (West Supp.1997) (amended 1998). This original tax appeal ensued. The parties have filed cross-motions for summary judgment.[2] Additional facts will be added as necessary.

## ANALYSIS AND OPINION

### Standard of Review

■ The State Board is afforded great deference when it acts within the scope of its

---

1. The Court notes that none of the sample rent-to-own lease agreements contain any reference to what the anticipated fair market value of the particular musical instrument being leased would be at the end of the lease term. However, the State Board does not dispute the values set forth in Seidman's affidavit. Therefore, the Court will assume that they are correct.

2. The State Board has not briefed the penalties issue. Therefore, the State Board's motion will be treated as a motion for partial summary judgment.

authority. *See King Indus. Corp. v. State Bd. of Tax Comm'rs,* 699 N.E.2d 338, 339 (Ind. Tax Ct.1998). Accordingly, the Court will only reverse a State Board final determination where that determination is unsupported by substantial evidence, is arbitrary or capricious, constitutes an abuse of discretion, or exceeds statutory authority. *See id.*

■ Summary judgment is proper only when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* IND. T.R. 56(C); *Dana Corp. v. State Bd. of Tax Comm'rs,* 694 N.E.2d 1244, 1246 (Ind. Tax Ct.1998). Cross-motions for summary judgment do not alter this standard. *See Hyatt Corp. v. Department of State Revenue,* 695 N.E.2d 1051, 1052–53 (Ind. Tax Ct.1998), *review denied.*

### Discussion

In Indiana, the taxability of tangible personal property is usually dependent on its use. Tangible personal property that is "[1] held for sale in the ordinary course of a trade or business; [2] held, used, or consumed in connection with the production of income; or [3] held as an investment" is taxable; all other tangible personal property (with a few exceptions not relevant here) is not. *See* IND.CODE ANN. § 6–1.1–1–11 (West Supp. 1998); § 6–1.1–1–19; § 6–1.1–2–1 (West 1989). Therefore, the use of the musical instruments in this case governs their taxability, and in this case, their use is governed by who owns them, Paige or its customers. If Paige owns them, they are being used in connection with the production of rental income, and are therefore taxable, and if Paige's customers own them, they are nontaxable consumer property.

■ Once it has been determined that certain tangible personal property is indeed taxable, the question becomes who is liable for that tax. Under IND.CODE ANN. § 6–1.1–2–4 (West 1989) (amended 1997), the State Board may look to the owner or possessor of tangible personal property for payment of the property tax. *See State Bd. of Tax Comm'rs v. Jewell Grain Co.,* 556 N.E.2d 920, 922 (Ind.1990); *Dav–Con, Inc. v. State Bd. of Tax Comm'rs,* 702 N.E.2d 1137, 1140 (Ind. Tax Ct.1998), *petition for review filed,* Feb.

22, 1999. The term owner has been defined by the Legislature for purposes of property taxation. Under IND.CODE ANN. § 6–1.1–1–9(b) (West 1989), the general rule is that the owner of tangible personal property is the legal title holder to the property. One exception to the general rule occurs when tangible personal property is security for a debt and the debtor is in possession of the property. In those instances, "the debtor is the owner of that property." IND.CODE ANN. § 6–1.1–1–9(e) (West 1989).

■ Paige contends that notwithstanding the language in the rent-to-own lease stating that Paige is the holder of legal title of the musical instruments, subsection 6–1.1–1–9(e) requires the conclusion that Paige is not the owner of the musical instruments for purposes of the personal property tax. In support of this contention, Paige notes that this Court has previously looked to the law of security interests for guidance in determining the owner of property under subsection 6–1.1–1–9(e). *See Kimco Leasing, Inc. v. State Bd. of Tax Comm'rs,* 656 N.E.2d 1208 (Ind. Tax Ct.1995), *review denied.* In Paige's view, application of the law of security interests leads to the conclusion that the rent-to-own leases actually constituted conditional sales and that Paige's retention of title to the musical instruments in the rent-to-own lease agreements constituted disguised security interests. Therefore, in Paige's view, the musical instruments secured debts owed to Paige and, as a result, Paige is not the owner of the musical instruments under subsection 6–1.1–1–9(e).

In response, the State Board advances two arguments. The State Board contends that although the Court has previously looked to the law of security interests in determining questions of ownership arising under subsection 6–1.1–1–9(e), the Court may not do so in this case because the law of security interests by statute does not apply to the rent-to-own lease agreements at issue in this case and that, in any event, application of the law of security interests leads to the conclusion that the rent-to-own lease agreements are true leases and do not grant Paige security interests in the musical instruments.

The parties agree that the rent-to-own lease agreements at issue in this case constitute rental purchase agreements as that term is defined in IND.CODE ANN. § 24-7-2-9 (West 1995). Consequently, under IND.CODE ANN. § 24-7-1-2 (West 1995), the law of security interests does not apply to the rent-to-own lease agreements.[3] This leads to the question of whether the Court may look to the law of security interests to determine the owner of the musical instruments for purposes of property taxation.[4]

Under subsection 6-1.1-1-9(e), the Court must determine whether the musical instruments at issue secure a debt in order to decide this case. This is a question of tax law. The statutes governing rental purchase agreements govern the relationship between rental purchasers and rental sellers; they evince no intent to enter the property tax field.[5] Consequently, the Court concludes that it does not violate section 24-7-2-9 to look to the law of security interests for guidance in determining whether Paige owned the musical instruments for property taxation purposes.

IND.CODE ANN. § 26-1-1-201(37) (West 1995) defines a security interest and provides in pertinent part:

"Security interest" means an interest in personal property or fixtures which secures payment or performance of an obligation. The retention or reservation of title by a seller of goods notwithstanding shipment or delivery (IC 26-1-2-401) is limited in effect to a reservation of a security interest. . . .

Whether a transaction creates a lease or security interest is determined by the facts of each case. However, a transaction creates a security interest if the consideration the lessee is to pay to the lessor for the right to possession or use of the goods is an obligation for the term of the lease not subject to termination by the lessee and:

(a) the original term of the lease is equal to or greater than the remaining economic life of the goods;

(b) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods;

(c) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration upon compliance with the lease agreement; or

(d) the lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

A transaction does not create a security interest merely because it provides that:

(a) the present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use if the goods is substantially equal to or is greater than the fair market value of the

---

3. Section 24-7-1-2 provides in pertinent part:

> Except as provided in this article, the provisions of:
>
> . . .
> (3) IC 26-1-1-201(37);
> (4) IC 26-1-2 concerning the creation of a security interest in property; [and]
> (5) IC 26-1-9
>
> . . .
> do not apply to a rental purchase agreement.

4. The Court notes that nowhere in the State Board's written findings is there any mention of this issue. Rather, the State Board is attempting to raise this issue for the first time in this original tax appeal. It is well-settled that the "State Board may not, in general, support a final determination by referring to reasons that were not previously ruled upon, but that are offered as

post hoc rationalizations." *Word of His Grace Fellowship, Inc. v. State Bd. of Tax Comm'rs*, 711 N.E.2d 875, 878 (Ind. Tax Ct.1999). Moreover, despite the State Board's contention that the law of security interests does not apply in this case, the State Board used the law of security interests in arriving at its conclusion that Paige owned the musical instruments and was subject to property tax on them. Thus, the State Board's litigation position conflicts with the reasoning of its own final determination.

However, Paige fails to address the post hoc nature of the State Board's argument in its brief. Consequently, any complaints along those lines are waived, and the Court will decide the issue on the merits.

5. The statutes governing rental purchase agreements address only sales and use taxes. *See* IND.CODE ANN. § 24-7-5-7 (West 1995).

goods at the time the lease was entered into;

(b) the lessee assumes risk of loss of the goods, or agrees to pay taxes, insurance, filing, recording, or registration fees, or service or maintenance costs with respect to the goods;

(c) the lessee has an option to renew the lease or to become the owner of the goods;

(d) the lessee has an option to renew the lease for a fixed rent that is equal to or greater than the reasonably predictable fair market for the use of the goods for the term of the renewal at the time the option is to be performed; or

(e) the lessee has the option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value of the goods at the time the option is to be performed.

In *Kimco Leasing*, 656 N.E.2d at 1217, this Court construed this statutory provision as embodying two separate tests for determining whether a lease is a true lease or a disguised security interest.

■ Under the first test, which this Court in *Kimco* called the "bright line" test, a lease creates a security interest if: "1) the lessee is obligated to perform for the full length of the lease without being able to voluntarily terminate it," and 2) one of the four enumerated conditions in subsection 26–1–1–201(37) is present. *Id.* (citing IND.CODE ANN. § 26–1–1–201(37); *In re Zaleha*, 159 B.R. 581, 584 (Bankr.D.Idaho 1993); *In re Lerch*, 147 B.R. 455, 457 (Bankr.C.D.Ill.1992)). In this case, as Paige concedes, the lessees are not obligated to perform for the full length of the leases. As a result, the rent-to-own leases cannot create security interests under the "bright line" test.

■ The second test is called the "meaningful residual interest" test. Under that test, the Court must determine whether the lessor can "reasonably expect to receive back anything of value at the end of the lease term." *Id.* at 1218. If so, then the lease is a true lease, if not, then the lease creates a security interest. *See id.* (citing *Zaleha*, 159 B.R. at 584). In evaluating whether the

lessor can expect to receive back anything of value when the lease term ends, the court must consider: "1) whether the lease contains an option to purchase for no or nominal consideration, and 2) whether the lessee develops equity in the leased property such that the only sensible decision economically is to exercise the purchase option." *Id.* (citing *Zaleha*, 159 B.R. at 584). The reason behind this formulation is that if these two conditions are met, it may be presumed that the lessee will exercise the purchase option and that at the end of the lease term, the lessor will only receive very little or nothing at all. Thus, retention of title by the lessor can only be looked upon as means of securing payments due under the lease contract. *See TKO Equip. Co. v. C & G Coal Co.*, 863 F.2d 541, 544–45 fn* (7th Cir.1988) (where payments under lease contract are mandatory and are equivalent of debt and an option to purchase at a trivial cost follows the mandatory payments, the lease contract is intended for security). Paige contends that the rent-to-own leases satisfy the "meaningful residual interest" test thereby creating a security interest. This, in Paige's view, would mean that under subsection 6–1.1–1–9(e), Paige is not the owner of the musical instruments for property taxation purposes and thus is not liable for personal property tax on them. The Court cannot agree.

There can be no doubt that in this case Paige's customers build up equity in the musical instruments they lease as they renew the rent-to-own lease agreements and that they may purchase the musical instruments for a small amount of consideration (when compared to the fair market value of the musical instruments) at the end of the lease term. Therefore, if Paige's customers choose to renew the rent-to-own lease agreements for the entire term, then the only sensible option at the end of the lease term would be to purchase the musical instruments for the purchase option price. For example, at the end of the thirty-month lease term, the customer may purchase the leased Bach Trumpet with a fair market value of $192 for $14.73. The customer would, of course, be well-advised to exercise the purchase option. This conclusion is borne out by Mr. Seidman's affidavit, in which he states

that he is unaware of any customer who renewed the rent-to-own lease for the entire term and failed to exercise the purchase option.

This would seem to satisfy the "meaningful residual interest" test and thereby compel the conclusion that the rent-to-own lease agreements create security interests. But there is a missing element in this analysis, namely, the fact that the lessees are not required to complete the lease term. Paige maintains that the lessees' ability to terminate the lease prior to the completion of the lease term is irrelevant to the "meaningful residual interest" test. In support of this position, Paige correctly notes that in *Kimco,* this Court did not make any reference to whether the lessees in that case could terminate their leases when analyzing the leases at issue under the "meaningful residual interest" test.

However, in *Kimco,* the leases at issue in that case were not terminable by the lessee. Therefore, this Court was not called upon to deal with the relevance of a lessee's ability to terminate a lease in determining whether the lease really creates a disguised security interest. As a result, Paige's argument that the lessees' ability to terminate the rent-to-own lease agreements before the completion of the lease term is irrelevant is nothing more than an attempt to make an affirmative statement from *Kimco's* silence on the point.[6] In addition, the Court notes that when subsection 26–1–1–201(37) was amended in 1991, the Legislature added language concerning leases not subject to termination by the lessee. *See* Act of May 5, 1991, No. 189, § 2, 1991 Ind. Acts 2800, 2804–05. In light of this amendment, it can hardly be argued that the Paige's customers' ability to terminate the lease with no further obligation is irrelevant.

Instead, as the State Board points out, Paige's customers' ability to terminate the rent-to-own lease agreements goes to the heart of the matter. Because Paige's customers can terminate the rent-to-own lease

agreements, there is simply no obligation to secure, and therefore there can be no security interest created by these rent-to-own lease agreements. *See In re Powers,* 983 F.2d 88, 90 (7th Cir.1993) ("where . . . a lessee has the right to terminate the lease before the option to purchase the property for no or nominal consideration, the lease is a true lease and not a conditional sale") (citing *In re Marhoefer Packing Co.,* 674 F.2d 1139, 1142–43 (7th Cir.1982)); *In re Mahoney,* 153 B.R. 174, 177–78 (E.D.Mich.1992); *In re Morris,* 150 B.R. 446, 448–49 (Bankr.E.D.Mo.1992); *In re Spears,* 146 B.R. 772 (S.D.Ill.1992); *cf. In re Jarrells,* 205 B.R. 894 (Bankr.M.D.Ga.1997) (holding rent-to-own lease a true lease after examining facts of the case). This is not a technical defect to be overlooked by invoking the economic realities of these transactions. Without an obligation to secure, how is it possible to have a security interest? The answer is that it is not possible unless one does violence to the plain language of subsection 26–1–1–201(37), which requires the securing of a payment or performance of an obligation in order for a security interest to exist. Looking to the facts of each case, as subsection 26–1–1–201(37) directs, does not make the fundamental requirement of an obligation any less fundamental, nor does it allow that requirement to be ignored.

In arriving at this conclusion, the Court is not unaware of the contrary decisions of some courts. For example, in *In re Barnhill,* 189 B.R. 611 (Bankr.D.S.C.1992), the Court concluded that a rent-to-own agreement similar to the one at bar created a security interest despite the fact that the lessee could terminate the lease at will. Another example is found in *In re Puckett,* 60 B.R. 223 (Bankr.M.D.Tenn.1986), *aff'd,* 838 F.2d 471 (6th Cir.1988), where the court found an obligation to buy the leased goods despite the fact that the lessee could terminate the lease agreement at will. The Court stated,

---

6. Besides *Kimco,* Paige cites two cases, *Orix Credit Alliance, Inc. v. Pappas,* 946 F.2d 1258 (7th Cir.1991) and *In re Howell,* 161 B.R. 285 (Bankr.N.D.Fla.1993), in which the ability of the lessee to terminate the lease prior to the completion of the lease term was not at issue. These

cases shed no light on the relevancy of Paige's customers' ability to terminate the rent-to-own lease agreements on whether those agreements created a true lease or a disguised security interest.

The right to terminate has historical significance, but the argument that a termination clause negates the existence of a real obligation is unpersuasive where the customer's choice is to continue making payments or to forfeit substantial rights and interests in the collateral. * * * Where the right to terminate involves a forfeiture, the option on paper cannot overcome the substance of the transaction: the termination option has simply been paid for by the debtor as part of the underlying sale.

*Puckett,* 60 B.R. at 239–40; *see also South Carolina Rentals, Inc. v. Arthur,* 187 B.R. 502 (D.S.C.1995) (finding security interest despite fact that lessee could terminate rent-to-own purchase agreement at will); *In re Fogelsong,* 88 B.R. 194 (Bankr.C.D.Ill.1988) (same). This point of view may have merit if one is attempting to rescue an insolvent lessee from the harsh consequences of forfeiture.[7] *Cf. Skendzel v. Marshall,* 261 Ind. 226, 301 N.E.2d 641, 650 (1973) ("[F]orfeiture [in a land sale contract] may only be appropriate under circumstances in which it is found to be consonant with notions of fairness and justice under the law."), *cert. denied,* 415 U.S. 921, 94 S.Ct. 1421, 39 L.Ed.2d 476 (1974). However, the tug on the heartstrings (and the attractiveness of those cases) is considerably less powerful in situations where a lessor is attempting to disclaim the language of a contract it drafted.[8] *See TKO Equip. Co.,* 863 F.2d at 544–45. Furthermore, the Court notes that these cases were decided under a previous version of UCC § 1–201(37), which contained language (now deleted) directing the Court to examine the intent of the parties and which did not contain the language concerning leases not subject to termination by the lessee.[9] Accordingly, these cases are not persuasive.

Also, even if the Court were to apply the reasoning of *Barnhill, Puckett, Arthur* and *Fogelsong* to this case, the conclusion that these rent-to-own lease agreements do not create security interests would not change. As both parties correctly note, the Court must determine whether the rent-to-own lease agreements are true leases or create security interests by examining the conditions at the inception of the lease agreements. *See Kimco Leasing,* 656 N.E.2d at 1215. Were that not the case, intervening events could change what was originally a true lease into a security interest, or vice versa. *See id.*

As Paige notes (and the State Board implicitly acknowledges), it is undoubtedly true that at the end of the lease term Paige's customers would be foolish to fail to exercise the purchase option that they have bargained for. However, under *Kimco,* the Court must analyze the situation existing when the

---

7. The Court, of course, expresses no view concerning how courts applying Indiana law are to deal with the possibility of forfeiture in these cases. The statutory command that the law of security interests does not apply to rental purchase agreements may mitigate the harshness of the requirement of an obligation before a court may set aside lease language in a rental purchase agreement in order to avoid a forfeiture. On the other hand, the statutory command may mean that courts may not find that a rental purchase agreement creates a security interest and that the only protections available to a lessee in those cases are found in the statutes governing rental purchase agreements.

8. In Indiana, a taxpayer is not necessarily estopped from denying the terms of a contract it has drafted. *See Mason Metals Co. v. Department of State Revenue,* 590 N.E.2d 672, 677 (Ind. Tax Ct.1992). However, this principle does not require the Court to turn a blind eye to the difference between the situation faced by the *Barnhill, Puckett, Arthur* and *Fogelsong* courts and the situation faced by this Court today. The Court also notes that if this case were actually governed by the UCC, it is highly unlikely that Paige, as the drafter of these agreements, would be allowed to deny its characterization of these agreements. *See TKO Equip. Co.,* 863 F.2d at 544–45 (noting difference between situations where strangers to a transaction attack the characterization of the transaction and where a party to the transaction does so).

9. It is important to note that the Court is not relying on the fact that certain leases that are not terminable at the will of the lessee are deemed to create security interests for its conclusion that all leases that are terminable at the will of the lessee are not security interests. (That there are leases that are not terminable at the will of the lessee that create security interests does not mean, by itself, that leases that are terminable at the will of the lessee cannot create security interests.) Rather, the Court is relying on the fact that subsection 26–1–1–201(37) speaks in terms of an obligation to secure for this conclusion.

agreement is made, not the situation existing at the end of the lease term. At the inception of the lease agreement, Paige's customers are not bound by contract to see the lease agreements through to completion. Nor are they bound to do so by the economic realities of these agreements. Nothing compels Paige's customers to keep paying until the musical instruments may be purchased for a nominal price.[10] This is amply demonstrated by the fact that 40% of Paige's customers who enter into the rent-to-own lease agreements terminate these agreements prior to the completion of the lease term.[11] *Cf. Marhoefer Packing Co.*, 674 F.2d at 1143 n. 3 (in order for transaction to constitute a conditional sale, buyer must be bound to take title or pay purchase price, therefore where buyer can terminate transaction, lease cannot constitute a conditional sale) (quoting S. WILLISTON, THE LAW GOVERNING SALES OF GOODS AT COMMON LAW AND UNDER THE UNIFORM SALES ACT § 336, at 528 (1908)). As the State Board put it, "it is difficult to believe that these lessees are making an illogical economic decision." (State Bd. Final Determination ¶ 13). Therefore, even if the Court were to look at the economic realities of these agreements, as Paige asks, the Court could still find no economic compulsion that would satisfy the requirement of an obligation on the part of Paige's customers.

Finally, even assuming that these rent-to-own lease agreements create security interests under the law of security interests, this would not be dispositive in determining the application of subsection 6–1.1–1–9(e) to this case. As stated above, the Court is only looking to the law of security interests for *guidance* in this area. Subsection 6–1.1–1–9(e) requires that the property secure payment of a debt. In no way can these rent-to-own lease agreements be said to make (other than for the trial rental period) debtors out of Paige's customers. Therefore, the requirement of subsection 6–1.1–1–9(e) that there be a debt to secure is not satisfied in this case. Accordingly, the Court holds that subsection 6–1.1–1–9(e) does not relieve Paige of its ownership of the musical instruments at issue for property taxation purposes.

Up until now, the Court has focused on Paige's arguments concerning the operation of subsection 6–1.1–1–9(e). However, this case raises another issue, which is alluded to, but not fully discussed, in Paige's briefs. As noted above, under section 6–1.1–2–4, the owner and possessor of personal property are jointly liable for personal property tax. *See Jewell Grain Co.*, 556 N.E.2d at 922. This coupled with the exclusion of consumer personal property from personal property tax also described above leads to an interesting problem. If the musical instruments are subject to personal property tax because they are owned by Paige and thus are used in the production of income, then under the plain language of section 6–1.1–2–4, Paige's customers may become liable for the tax, despite the fact that if Paige's customers owned the musical instruments outright, they would not be liable for the tax.[12]

---

**10.** The right of Paige's customers to "walk away" from these rent-to-own lease agreements is valuable. *See Powers*, 983 F.2d at 91. The customer (or the customer's child) may decide after a few months that playing a musical instrument is not desirable. In those cases, the customer may return the musical instrument with no further obligation.

**11.** In his affidavit, Mr. Seidman stated that the 40% figure was "reasonable [because] the number of canceled agreements may or may not be attributed to new agreements written during the same calendar year and the fact that the percentage includes instruments that are merely exchanged for other instruments." (Seidman Aff'd ¶ 10). This does not alter the fact that a signifi-

cant number of Paige's customers do not renew the agreements for the full lease term.

**12.** This problem, of course, may be avoided by finding that Paige's customers own the musical instruments. In that way, the musical instruments would not be taxable in the first instance because they would be non-taxable consumer property. *See* IND.CODE ANN. § 6–1.1–1–11. This conclusion could not be based on subsection 6–1.1–1–9(e) because, as demonstrated above, Paige's customers are not debtors. It would have to be based on a determination that title to the musical instruments for property taxation purposes vested in the lessees at the inception of the rent-to-own lease agreement. *See* IND.CODE ANN § 6–1.1–1–9(b). However, such a determination would have no support in the relevant statutory provisions.

However, the Court need not delve further into this issue. In this case, the State Board has not pursued Paige's customers for payment of the tax, and Paige has no right of action against its customers to reimburse Paige for payment of the tax. *See* IND.CODE ANN. § 6–1.1–2–4 (allowing *possessor* to recover taxes paid from owner unless owner and possessor have agreed to other terms in a contract). Consequently, the Court is not called upon to determine if section 6–1.1–2–4 is to be applied literally if the State Board chose to pursue Paige's customers for payment of the tax. Moreover, the mere fact that section 6–1.1–2–4 may not be applied literally with respect to certain possessors does not change the operation of section 6–1.1–1–9 or section 6–1.1–2–4 with respect to an owner.

## CONCLUSION

The musical instruments are used in the production of income and are owned by Paige. Therefore, they are subject to personal property tax, and Paige is liable for that tax. Accordingly, the Court now GRANTS partial summary judgment on behalf of the State Board and DENIES Paige's motion for summary judgment.