**In re QDS COMPONENTS, INC., Debtor.**

**No. 00–36441.**

United States Bankruptcy Court, S.D. Ohio, Western Division at Dayton.

Oct. 1, 2002.

Ronald E. Gold, Cincinnati, OH, for Debtor.

Julie Kaplan Zurn, Daniel A. DeMarco, Cleveland, OH, for U.S. Bancorp Leasing & Financial.

Randy T. Slovin, Cincinnati, OH, for Marcap Vendor Finance Corp.

Michael L. Molinaro, Chicago, IL, for Lakin Manufacturing Company.

Paul V. Possinger, Chicago, IL, for Heller Financial, Inc.

Alan J. Statman, Thomas R. Noland, Cincinnati, OH, for Unsecured Creditors' Committee.

### *MEMORANDUM OPINION*

JOHN E. HOFFMAN, Jr., Bankruptcy Judge.

Prior to filing this Chapter 11 case, QDS Components, Inc. ("QDS" or the "Debtor") entered into agreements, denominated leases, providing for the use of two Johnford TC–35 Turning Centers (the "Lathes"). The issue before the Court is whether the agreements constitute true leases or, as alleged by Lakin Manufacturing Company ("Lakin"), disguised security agreements.

This memorandum opinion constitutes the Court's findings of fact and conclusions of law. Fed.R.Civ.P. 52 (made applicable here by Fed. R. Bankr.P. 7052 and 9014).

### I. *Jurisdiction*

The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157 and 1334 and the general order of reference entered in this district. This is a core proceeding. 28 U.S.C. § 157(b)(2).

### II. *Factual and Procedural Background*

QDS filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on December 6, 2000 (the "Petition Date"). Prior to the Petition Date, QDS was engaged in the manufacture and sale of non-powered hubs and spindles for the agricultural market and rubber torsion axles used for agricultural equipment, recreational vehicles, and medium-weight trailers. As of the Petition Date, the Debtor's manufacturing operations were conducted at a

plant located in Jackson Center, Shelby County, Ohio (the "QDS Facility").

On May 18, 2000, approximately seven months before the Petition Date, QDS and Intech Funding Corp. ("Intech") entered into the agreements in question—two substantially identical contracts entitled "Equipment Lease Agreement Number L0002447" ("Lease One") and "Equipment Lease Agreement Number L0002448" ("Lease Two") (collectively, the "Lease Agreements"). Under the Lease Agreements, QDS obtained the use of the Lathes, which were supplied by a third-party (Absolute Machine Tools, Inc.). The purchase price of each Lathe was $90,650.

The terms of the Lease Agreements are identical. Each of the Lease Agreements requires QDS to make payments to Intech totaling $110,425. Specifically, under each of the Lease Agreements, QDS is required to make: (1) prepayments totaling $27,195, consisting of a one-time, lump-sum payment of $24,326, plus an additional $2,870, which represents the advance payment of two regular monthly installments of $1,435; and (2) 58 monthly payments of $1,435. At the end of the 60–month term of the Lease Agreements, QDS has the option to purchase each Lathe for $9,065 (the "Option Amount") plus applicable taxes. The Lease Agreements provide that, if QDS does not exercise its purchase option, it may either: (1) deliver the Lathes to Intech;[1] or (2) continue in possession of the Lathes, in which case the Lease Agreements automatically renew for successive one-month terms at the regular monthly installment amount of $1,435. Lease Agreements, ¶ 15.

The Lease Agreements contain an "Early Termination" provision that states, in relevant part:

EARLY TERMINATION. If no default exists under this Lease, you have the right upon thirty (30) days written notice to purchase all the Equipment, but not less than all the Equipment, and terminate the Lease. The purchase price will be the sum of (a) + (b) + (c) as follows: (a) the net present value of all unpaid Lease payments for the remainder of the term discounted at 7.0% A.P.R.; (b) the net present value of the purchase option discounted at 7.0% A.P.R.; (c) all other amounts due or that become due under the Lease. Upon our receipt from you of the purchase price calculated as (a) + (b) + (c) above we shall transfer our interest in the Equipment to you without representation, recourse, or warranty as is, where-is and we shall deliver all documents reasonably requested to transfer our interest in the Equipment to you.

Lease Agreements, ¶ 10.

Under the Lease Agreements, Intech expressly disclaimed all warranties. *Id.*, ¶ 8. QDS bore the full risk of loss and was required to insure the Lathes at its own expense. *Id.*, ¶¶ 11 and 12. In addition, QDS had to pay directly or reimburse Intech for all applicable taxes and fees. *Id.*, ¶ 13. QDS also was responsible for paying all maintenance expenses. *Id.*, ¶ 14. In the event of a default by QDS, the Lease Agreements afforded Intech the following remedies:

(a) [Intech] may cancel or terminate this Lease or any or all other agree-

---

1. The Lease Agreements state:
 Unless you purchase the Equipment in accordance with this Lease, at the end of this Lease, you will immediately deliver the Equipment to us in as good condition as when you received it, except for ordinary wear and tear, to a location selected by us. You will pay all expenses of deinstalling, crating and shipping, and you will insure the Equipment for its full replacement value during shipping.
 Lease Agreements, ¶ 14.

ments that we have entered into with you; (b) we may require you to immediately pay us, as compensation for loss of our bargain and not as a penalty, a sum equal to (i) the value of all unpaid Lease Payments for the remainder of the term plus the value of our anticipated residual interest in the Equipment, plus (ii) all other amounts due or that become due under this Lease; (c) we may require you to deliver the Equipment to us as set forth in Section 14; (d) we or our agent may peacefully repossess the Equipment without court order and you will not make any claims against us for damages or trespass or any other reason; and (e) we may exercise any other right or remedy available at law or in equity.

*Id.*, ¶ 18.

The Lease Agreements recite that Intech is the owner of the Lathes:

TITLE; RECORDING. [Intech is] the owner of and will hold title to the Equipment. You will keep the Equipment free of all liens and encumbrances. Unless the Purchase Option price shown on the front of this Lease is $1.00, you agree that this transaction is a true lease. However, if this transaction is deemed to be a lease intended for security, you grant us a purchase money security interest in the Equipment (including any replacements, substitutions, additions, attachments and proceeds) and the equipment shall secure, in addition to the lease obligations, any indebtedness at any time owed by you to us. You will deliver to us signed financing statements or other documents we request to protect our interest in the equipment. YOU AUTHORIZE U.S. TO FILE A COPY OF THIS LEASE AS A FINANCING STATEMENT AND APPOINT U.S. OR OUR DESIGNEE AS YOUR ATTORNEY–IN-FACT TO EXECUTE AND FILE, ON YOUR BEHALF, FINANCING STATEMENTS COVERING THE EQUIPMENT.

*Id.*, ¶ 15. Pursuant to the foregoing provision, Intech filed financing statements covering the Lathes with the Ohio Secretary of State and the Shelby County Recorder.

On May 24, 2000, Intech assigned Lease One to Marcap Vendor Finance Corp. ("Marcap"). Two days later, on May 26, 2000, Intech assigned Lease Two to U.S. Bancorp Leasing & Financial ("U.S. Bancorp"). At approximately the same time that Intech assigned Lease Two to U.S. Bancorp, Heller Financial, Inc. ("Heller"), which held a blanket lien on all the assets of the Debtor, transmitted a letter to U.S. Bancorp acknowledging Heller's agreement to subordinate its security interest in the Lathe that is the subject of Lease Two (the "U.S. Bancorp Lathe") to the security interest granted to U.S. Bancorp under the Lease Agreement.

After determining that a reorganization of its business would not be possible, QDS sought and obtained Court authority to sell substantially all of its assets to Lakin pursuant to § 363(b) of the Code (the "Asset Sale"). The order authorizing the Asset Sale, which was entered on January 17, 2001 (the "Sale Order"), also granted the Debtor authority to assume and assign to Lakin its lease of the QDS Facility and a "Gas Vessel Rental Agreement" with BOC Gases. The Sale Order contained the following provision: "Any of the Purchased Assets that are subject to a lease will be transferred and conveyed to [Lakin] without further consideration in the event that the lease is deemed to be a capital lease as compared to a true lease or operating lease" (the "Capital Lease Provision").

After the Asset Sale closed, the Debtor requested and obtained an order authorizing it to assume and assign to Lakin ten

unexpired leases and executory contracts. The Debtor also filed a motion seeking authority to reject certain of its remaining unexpired leases and executory contracts, including the Lease Agreements (the "Rejection Motion"). Shortly before the Rejection Motion was filed, U.S. Bancorp filed a motion for relief from the automatic stay, seeking an order authorizing it to recover the U.S. Bancorp Lathe (the "U.S. Bancorp Motion"). Invoking the Capital Lease Provision, Lakin opposes both the Rejection Motion (insofar as it requests authority to reject the Lease Agreements) and the U.S. Bancorp Motion. Lakin asserts, based on the Capital Lease Provision, that the Lease Agreements are, in fact, disguised security agreements. In Lakin's view, the Lathes are property of QDS (subject to the security interests of U.S. Bancorp, Marcap, and Heller) properly transferred to Lakin by way of the Sale Order. U.S. Bancorp and Heller take the contrary position, asserting that the Lease Agreements are true leases.

Following discovery, U.S. Bancorp, Heller, and Lakin agreed to submit the dispute upon the following stipulated facts (the "Initial Stipulation"):

(1) The fair market value of the U.S. Bancorp Lathe will be $12,000 at the expiration of the Lease Agreements—i.e., in May 2005;

(2) The cost of shipping and rigging the U.S. Bancorp Lathe from its present location at the QDS Facility to either Portland, Oregon or Los Angeles, California would not exceed $7,200 (including insurance);

(3) The cost of shipping and rigging the U.S. Bancorp Lathe from its present location to a local storage facility would be approximately $1,500 to $2,500 and would cost approximately $100 per month to store (including insurance); and

(4) The remaining useful life of the U.S. Bancorp Lathe is at least five to six years—i.e., its useful life will extend until at least 2006.

In addition to the Initial Stipulation, the Court also received briefs from the Debtor, Lakin, U.S. Bancorp, and Heller addressing the issue of whether the Lease Agreements are true leases or disguised security agreements.

After the Court took the U.S. Bancorp Motion under advisement, Marcap filed a motion for relief from stay (the "Marcap Motion"), seeking an order authorizing it to recover the Lathe that is the subject of Lease One (the "Marcap Lathe"). Lakin opposed the Marcap Motion, again arguing that, because the Lease Agreements are in fact disguised security agreements, the Marcap Lathe had been transferred to Lakin free and clear of liens pursuant to the Sale Order. After the Marcap Motion was filed, the parties asked the Court to consolidate the U.S. Bancorp and Marcap Motions. Because the Lease Agreements are identical, and the U.S. Bancorp and Marcap Motions present the same legal issue, the Court agreed to the consolidation of the Motions.

On June 10, 2002, Lakin and Marcap filed a stipulation with the Court that essentially tracks the Initial Stipulation, under which Lakin and Marcap agreed to submit the Marcap Motion upon the following facts:

(1) The fair market value of the Marcap Lathe will be $12,000 at the expiration of the Lease Agreements—i.e., in May 2005;

(2) The cost of shipping and rigging the Marcap Lathe from its present location at the QDS Facility to either Portland, Oregon or Los Angeles, California would not exceed $7,200 (including insurance);

(3) The cost of shipping and rigging the Marcap Lathe from its present location to a local storage facility would be approximately $1,500 to $2,500 and would cost approximately $100 per month to store (including insurance); and

(4) The remaining useful life of the Marcap Lathe is at least five to six years—i.e., its useful life will extend until at least 2006.[2]

## III. *Arguments of the Parties*

Lakin asserts that the Lease Agreements constitute disguised security agreements rather than true leases. Thus, according to Lakin, the Lathes were: (1) owned by QDS at the time of the Asset Sale, subject to secured loans in favor of U.S. Bancorp and Marcap (collectively, the "Lessors"); and (2) transferred to Lakin pursuant to the Sale Order free and clear of liens, claims, and encumbrances, with the liens granted to the Lessors attaching to the proceeds of the Asset Sale. In Lakin's view, the proceeds of the Asset Sale should be distributed either to the Lessors or Heller, based upon the Court's determination of the relative priority of their security interests in the Lathes.

Lakin advances several arguments in support of its contention that the Lease Agreements are, in fact, disguised security agreements. First, Lakin maintains that, under § 1–201(37) of the Uniform Commercial Code ("UCC"), the Lease Agreements are conclusively presumed to have created security interests because QDS: (1) could not terminate its obligation to make payments for the entire term of the Lease Agreements; and (2) had the contractual right to become owner of the Lathes for nominal consideration. In support of its contention that the Option

Amount contained in the Lease Agreements is nominal, Lakin relies on UCC § 1–201(37)(x), arguing that the Option Amount is less than the Debtor's "reasonably predictable cost of performing under the [L]ease [A]greement[s] if the [purchase option] is not exercised." UCC § 1–201(37)(x) (West 2002). According to Lakin, the nominality of the Option Amount is also demonstrated by the application of "percentage tests"—which require a comparison of: (1) the Option Amount and cost of the Lathes; (2) the Option Amount and the total stream of rental payments made by QDS under the Lease Agreements; and (3) the total payment stream and the Lathes' original cost.

Alternatively, Lakin asserts that even if UCC § 1–201(37)'s conclusive presumption does not apply, the Lease Agreements should nonetheless be found to be disguised security agreements because the economics of the transactions reveal that neither Intech (the assignor of the Lease Agreements) nor the Lessors retained a meaningful reversionary interest in the Lathes. Given the cost involved to ship the Lathes back to the Lessors upon termination of the Lease Agreements and the Lathes' remaining economic life, Lakin maintains that Intech could not have reasonably expected to receive the Lathes back from QDS when the Lease Agreements terminated. Lakin also argues that Intech's failure to retain a meaningful reversionary interest in the Lathes is evidenced by "net lease terms" in the Lease Agreements—i.e., the Lease Agreements' provisions requiring QDS to: (1) pay all applicable taxes, fees, and maintenance expenses; (2) bear the risk of loss; and (3) insure the Lathes. Finally, Lakin points to the subordination agreement between

---

**2.** Marcap did nothing more than execute a stipulation that tracks the Initial Stipulation.

It chose not to brief any of the contested legal issues.

Heller and U.S. Bancorp, the large up-front payment QDS was required to pay Intech, and the fact that the Lathes were supplied by a third party as evidence that the Lease Agreements are, in fact, disguised security agreements.

U.S. Bancorp and Heller challenge Lakin's contention that UCC § 1–201(37)'s conclusive presumption applies. To trigger the statutory presumption, Lakin must show that: (1) QDS could not terminate its payment obligation under the Lease Agreements; and (2) the Option Amount is nominal. According to U.S. Bancorp and Heller, Lakin has failed on both counts. First, Heller points out that the Lease Agreements afford QDS a contractual right of termination. Second, U.S. Bancorp and Heller also contend that Lakin has not demonstrated that the Option Amount is nominal. They take issue with the methodology that Lakin employs to establish the Option Amount's nominality, which factors in the economic value of the Lathes that QDS will forego if it elects not to exercise the purchase option. U.S. Bancorp and Heller argue that the lost economic value of the Lathes is not a "cost of performing under the [L]ease [A]greements" within the meaning of UCC § 1–201(37)(x).

U.S. Bancorp and Heller also maintain that Lakin's reliance on percentage tests is misplaced, asserting that percentage tests have been rejected as an unreliable measure of nominality by courts and commentators alike. According to Heller, the most accepted and appropriate test for determining whether a purchase option amount is nominal requires a comparison of the option price with the projected fair market value of the "leased" goods at the time the option arises. Under this test, the option price is not nominal if it bears a reasonable relationship to the predicted residual value. Lakin has failed to demonstrate the nominality of the Option Amount under this standard, Heller argues, because it offered no evidence establishing what the original contracting parties projected the fair market value of the Lathes would be at the end of the term of the Lease Agreements. U.S. Bancorp further contends that a comparison between the stipulated fair market value of the Lathes at the end of the lease term and the Option Amount negates Lakin's nominality argument. According to U.S. Bancorp, while the $9065 Option Amount is less than the $12,000 stipulated fair market value of the Lathes, an Option Amount representing over three-fourths of stipulated fair market value is clearly not nominal.

U.S. Bancorp and Heller also argue that the Lessors did in fact retain a meaningful reversionary interest in the Lathes. They contend that the following factors demonstrate that the Lessors fully expected to receive something of value back from QDS upon expiration of the term of the Lease Agreements: (1) the Lathes' economic life extends beyond the term of the Lease Agreements; and (2) QDS is required to maintain, and insure the Lathes and return them to the Lessors at the end of the lease term. Moreover, according to U.S. Bancorp and Heller, the fact that the Lease Agreements are "net leases"—i.e., QDS is required to pay all applicable taxes and fees, pay all maintenance expenses, and bear the full risk of loss of the Lathes—simply does not establish that the Lessors relinquished their reversionary interest in the Lathes. They cite decisions holding that the inclusion of net lease terms in a purported lease does not constitute a valid basis for recharacterizing the agreement as a disguised secured sale. Heller also asserts that the fact that the Lathes were obtained from a third-party supplier should not be factored into the

Court's lease versus disguised security agreement calculus.

Finally, U.S. Bancorp raises several procedural arguments. First, it asserts that it was not afforded the opportunity to fully protect its rights because it did not receive notice—from either the Debtor or Lakin—prior to the hearing to consider approval of the Asset Sale (the "Sale Hearing") that Lakin would invoke the Capital Lease Provision and ask the Court to recharacterize the Lease Agreements. Had it received notice of Lakin's intentions, U.S. Bancorp argues, it would have opposed the Asset Sale. Second, U.S. Bancorp submits that Lakin should have been required to commence an adversary proceeding or an "independent contested matter" in order to challenge U.S. Bancorp's status as a true lessor. U.S. Bancorp Reply Brief (Doc. No. 104–1) at 6.

## IV. *Legal Analysis*

### A. *The True Lease vs. Disguised Security Agreement Conundrum*

#### 1. *Preliminary Statement*

##### a. *Applicable Law*

▇▇ The existence, nature, and extent of a security interest in property is governed by state law. *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). Thus, "whether a ... lease constitutes a security interest under the bankruptcy code will depend on whether it constitutes a security interest under applicable State or local law." *Powers v. Royce, Inc. (In re Powers)*, 983 F.2d 88, 90 (7th Cir.1993) (quoting S.Rep. No. 989, 95th Cong., 2d Sess. 26 (1978), U.S.Code Cong. & Admin.News 1978, 5787, 5812; H.R.Rep. No. 595, 95th Cong., 1st Sess. 314 (1977), U.S.Code Cong. & Admin.News 1978, 5963, 6271). *See also In re Kim*, 232 B.R. 324, 328 (Bankr.E.D.Pa.1999) ("It is well established that the question of whether an agreement that appears on its face to be a lease is in reality a security agreement is to be determined by reference to state law."). The Lease Agreements contain a California choice of law clause, and the parties agree that California law governs.[3]

UCC § 1–201(37), which is set forth in full *infra* at pp. 330–31, defines the term "security interest" and provides a test for distinguishing a true lease from a disguised security agreement. In 1988, California adopted the current version of UCC § 1–201(37), which had been amended as a uniform law in 1987.[4] *PSINet, Inc. v. Cisco Sys. Cap. Corp. (In re PSINet, Inc.)*, 271 B.R. 1, 43 (Bankr.S.D.N.Y.2001); *Addison v. Burnett*, 41 Cal.App.4th 1288, 1294, 49 Cal.Rptr.2d 132, 136 (1996).

#### b. *Burden of Proof*

▇▇ As the party asking the Court to characterize the Lease Agreements as "other than what [they] purport[ ] to be [,]" Lakin bears the burden of proof. *In*

---

**3.** Because the UCC is a uniform law, decisions from other state and federal courts interpreting § 1–201(37) also may be considered. *PSINet*, 271 B.R. at 43 n. 86 ("Although it is California's version of the UCC that applies, the Court is not limited to a discussion of cases decided under California law."); *Edison Bros. Stores*, 207 B.R. at 809 n. 7 ("Since the UCC has been adopted by all 50 states, and given the uniformity purpose of the UCC, decisions from other states are relevant.").

**4.** UCC § 1–201(37) has been codified as § 1201(36) of the California Commercial Code. Cal. Comm.Code § 1201(36) (West 2002). UCC § 1–201(37) and Cal. Comm. Code § 1201(36) are virtually identical: the minor deviations from the text of the UCC contained in California's version of the statute are nonsubstantive. For the sake of clarity, this Memorandum Opinion will refer to UCC § 1–201(37) rather than Cal. Comm.Code § 1201(36).

*re Murray*, 191 B.R. 309, 316 (Bankr. E.D.Pa.1996). *See also In re Triplex Marine Maint., Inc.*, 258 B.R. 659, 664 & n. 8 (Bankr.E.D.Tex.2000) (placing burden of proof on trustee "who is the party who asserts that the transaction is other than what it purports to be in a written agreement"); *In re Owen*, 221 B.R. 56, 60 (Bankr.N.D.N.Y.1998) ("The Debtors have the burden of demonstrating that the transaction was other than what it purports to be in the agreement."); *In re Edison Bros. Stores, Inc.*, 207 B.R. 801, 812 & n. 14 (Bankr.D.Del.1997) (imposing the burden of proof on the debtor "as the party seeking to characterize the Lease Agreement as an instrument other than a lease").

### c. Definitions of "Lease" and "Security Interest"

█ The authors of a leading treatise on the UCC define a lease, a sale, and a transaction creating a security interest as follows:

> A lease involves payment for the temporary possession, use and enjoyment of goods, with the expectation that the goods will be returned to the owner with some expected residual interest of value remaining at the end of the lease term. In contrast, a sale involves an unconditional transfer of absolute title to goods, while a security interest is only an inchoate interest contingent on default and limited to the remaining secured debt.

James J. White & Robert S. Summers, *Uniform Commercial Code* vol. 4, § 30–3, 14 n. 18 (5th ed., West 2002). The hallmark of a lease is that it grants the lessee the right to use property for a period less than its economic life with the concomitant obligation to return the property to the lessor while it retains some substantial economic life. *See In re Marhoefer Packing Co.*, 674 F.2d 1139, 1145 (7th Cir.1982) ("An essential characteristic of a true lease is that there be something of value to return to the lessor after the term. Where the term of the lease is substantially equal to the life of the leased property such that there will be nothing of value to return at the end of the lease, the transaction is in essence a sale."); *In re APB Online, Inc.*, 259 B.R. 812, 817 (Bankr. S.D.N.Y.2001) ("[W]hen we speak of the intent to sell or lease, we mean the intent to convey the use of the property for its remaining useful life to the lessee, or alternatively, to vest a reversionary interest in the lessor at the end of the term."); E. Carolyn Hochstadter Dicker & John P. Campo, *FF & E and the True Lease Question: Article 2A and Accompanying Amendments to UCC Section 1–201(37)*, 7 Am Bankr.Inst. L.Rev. 517, 533 & n. 48 (Winter 1999) ("[T]he principal characteristic of a lease, which distinguishes it from a secured transaction, is that it allows the lessee the right to use the leased property with an attendant opportunity to return the property to the lessor while it still has some 'substantial economic life.'" (quoting *In re New Items Co., Inc.*, 72 B.R. 1017, 1019 (Bankr.N.D.Ohio 1987))).[5]

While the foregoing concepts appear at first blush to be deceptively simple, courts have had great difficulty distinguishing a true lease from a disguised security agreement. *See* Ronald M. Bayer, *Personal Property Leasing: Article 2A of the Uniform Commercial Code*, 43 Bus. Law. 1491, 1497 (August 1988) (referring to an

---

**5.** Section 2A–103(1)(j) of the UCC defines "lease" as "a transfer of the right to possession and use of goods for a term in return for consideration, but a sale, including a sale on approval or a sale or return, or retention or creation of a security interest is not a lease." UCC § 2A–103(1)(j) (West 2002).

"enormous amount of confusion" in the caselaw); Michael W. Gaines, *Security Interests Under Article 2A: More Confusion in the Leasing Arena*, 18 Stetson L.Rev. 69, 69 (Fall 1988) (describing "the plethora of litigation regarding lease agreements and leased equipment"); Peter J. Coogan, *Reflections of a Drafter*, 43 Ohio St. L.J. 545, 550 (1982) (observing that courts "struggle with the idea of whether a lease with certain attributes is a 'true lease'" and noting the existence of "loads of cases that just cannot be reconciled"). Indeed, the issue of whether an arrangement is a true lease or a disguised security agreement is one of the most vexatious and oft-litigated issues under the UCC. *See Morris v. U.S. Bancorp Leasing & Fin. (In re Charles)*, 278 B.R. 216, 221 (Bankr.D.Kan. 2002) ("The issue of whether so-called 'finance leases' are in reality security agreements has vexed the courts for many years."); *Carlson v. Giacchetti*, 35 Mass. App.Ct. 57, 616 N.E.2d 810, 810 (1993) ("Whether, under the Uniform Commercial Code, an equipment lease is to be treated as a 'true lease' or as a security agreement is an issue that has been litigated extensively for two decades...."); White & Summers, § 30–3, at 12 ("The 'lease vs. security interest' issue [is] one of the most frequently litigated issues under the Uniform Commercial Code.").

To fully address and effectively dispose of the arguments raised by the parties, the Court must briefly explore the history of the governing statute—§ 1–201(37) of the UCC. The Court traces the development of the current version of § 1–201(37) and the body of hopelessly irreconcilable decisions construing it and the former version of the statute[6] not simply to provide historical perspective. The parties urge the Court to apply a number of different legal tests to determine whether the Lease Agreements are in fact true leases. It is therefore necessary to review the genesis and evolution of the various decisional standards in order to determine which of these various tests provides a sound basis for distinguishing a true lease from a disguised security agreement.

## 2. Distinguishing a True Lease From a Disguised *Security Agreement* Under "*Old § 1–201(37)*"

Prior to the 1987 revision to UCC § 1–201(37), the statute ("Old § 1–201(37)") read as follows:

> Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

UCC § 1–201(37) (West 1986) (amended 1987). Old § 1–201(37) provided only the few express guidelines for distinguishing a true lease from a disguised security agreement listed below:

(1) Whether a lease is intended for security is to be determined by the facts of each case;

**6.** *See Bayer*, 43 Bus. Law. at 1497 & n. 39 (noting the existence of "'a significant number of authorities ... to support almost every position imaginable dealing with the lease-security interest issue.'" (quoting Charles W. Mooney, Jr., *Personal Property Leasing: A Challenge*, 36 Bus. Law. 1605, 1611 (1981))); *Gaines*, 18 Stetson L.Rev. at 71 ("The development of the case law interpreting instruments purporting to be lease agreements has led to widely diverse analyses and results.").

(2) The existence of an option to purchase does not create a security interest as a matter of law; and

(3) An option to purchase for no or nominal consideration does make the lease a security interest as a matter of law.

These limited decisional guideposts, as well as the statute's reference to the intent of the parties, resulted in a "profusion of inconsistent views among the courts regarding the proper criteria to be applied in determining whether an agreement denominated as a lease created a true lease or a security interest." *Kim*, 232 B.R. at 329. *See also* Corinne Cooper, *Identifying a Personal Property Lease Under the UCC*, 49 Ohio St. L.J. 195, 199 (1987) (noting that under Old § 1–201(37) "the basis in law for distinguishing ... [a sale, a lease, or a security interest] has become hopelessly blurred").

Courts applying Old § 1–201(37) formulated a variety of tests to distinguish a true lease from a disguised security agreement. The decisions under Old § 1–201(37) generally fall into two broad categories: (1) cases in which courts distinguish a true lease from a disguised security agreement by applying a laundry list of factors (the "Multiple–Factor Approach"); and (2) cases in which courts distinguish a true lease from a disguised security agreement by utilizing various common law tests to determine whether the purchase option amount stated in a purported lease agreement is nominal. *See generally* White & Summers, § 30–3, at 20 (noting that "courts have often used a list of factors to distinguish a lease from a security agreement"); Laurie L. Dawley, *The Continuing Debate Regarding the Lease Versus Disguised Security Interest Issue: Did the Edison Court Correctly Find a True Lease?*, 24 J. Corp. L. 169, 182–83 (1998) (observing that "to uncover the economic realities of a transaction," some courts "apply a multi-factored approach"); *Am. President Lines, Ltd. v. Lykes Bros. S.S. Co. (In re Lykes Bros. S.S. Co.)*, 196 B.R. 574, 581 (Bankr.M.D.Fla.1996) (describing the various common law tests "[c]ourts have adopted ... to determine whether the option to purchase is nominal"); Cooper, 49 Ohio St. L.J. at 224 (discussing various common law nominality tests).

### a. *The Multiple–Factor Approach*

The bankruptcy court's decision in *K.L.C., Inc. v. Brookside Drug Store, Inc. (In re Brookside Drug Store, Inc.)*, 3 B.R. 120 (Bankr.D.Conn.1980) exemplifies the Multiple–Factor Approach. There, the court set forth the following list of 16 factors to be applied in determining whether an agreement created a true lease or a disguised security agreement:

(1) whether there was an option to purchase for a nominal sum;

(2) whether there was a provision in the lease granting the lessee an equity or property interest in the equipment;

(3) whether the nature of the lessor's business was to act as a financing agency;

(4) whether the lessee paid a sales tax incident to acquisition of the equipment;

(5) whether the lessee paid all other taxes incident to ownership of the equipment;

(6) whether the lessee was responsible for comprehensive insurance on the equipment;

(7) whether the lessee was required to pay any and all license fees for operation of the equipment, and to maintain the equipment at his expense;

(8) whether the agreement placed the entire risk of loss upon the lessee;

(9) whether the agreement included a clause permitting the lessor to acceler-

ate the payment of rent upon default of the lessee and granted remedies similar to those of a mortgagee;

(10) whether the equipment subject to the agreement was selected by the lessee and purchased by the lessor for this specific lessee;

(11) whether the lessee was required to pay a substantial security deposit in order to obtain the equipment;

(12) whether the agreement required the lessee to join the lessor, or permit the lessor by himself, to execute a UCC financing statement;

(13) whether there was a default provision in the lease inordinately favorable to the lessor;

(14) whether there was a provision in the lease for liquidated damages;

(15) whether there was a provision disclaiming warranties of fitness and/or merchantability on the part of the lessor; and

(16) whether the aggregate rentals approximated the value or purchase price of the equipment.

*Id.* at 122–23. *See also Venn v. Howell's Auto Repair Ctr. (In re Howell),* 161 B.R. 285, 289 (Bankr.N.D.Fla.1993) (applying a 12–factor test); *Amvest Funding Co. v. Rex Group, Inc. (In re Rex Group, Inc.),* 80 B.R. 774, 779 (Bankr.E.D.Va.1987) (setting forth a nine-factor test for distinguishing a true lease from disguised security agreement); *In re Standard Fin. Mgmt. Corp.,* 79 B.R. 100, 102 (Bankr.D.Mass. 1987) (adopting the 16–factor test articulated in *Brookside* ); *Keydata Corp. v. Int'l Paper Credit Corp. (In re Keydata Corp.),* 18 B.R. 907, 910 (Bankr.D.Mass. 1982) (listing six factors that are indicative of a disguised security agreement); Cooper, 49 Ohio St. L.J. at 230 (identifying 10 factors that courts deem "to create a disguised security interest"); White & Sum-

mers, § 30–3, at 21–22 (identifying a 10–factor "laundry list").

The rationale underlying the Multiple–Factor Approach is that certain rights and obligations—"incidents of ownership"—are allocated to one party under a lease and to the other in a sale. *APB Online,* 259 B.R. at 821. Courts following the Multiple–Factor Approach reason that a lessee's assumption and discharge of substantially all the risks and obligations ordinarily associated with the outright ownership of the property is more indicative of a financing transaction than a true lease. *See, e.g., Adelman v. Gen. Motors Acceptance Corp. (In re Tulsa Port Warehouse Co.),* 690 F.2d 809, 811–12 (10th Cir.1982) (applying Multiple–Factor Approach and finding purported lease agreement created a security interest where "[t]he lessee is required to obtain comprehensive insurance in favor of the lessor; pay sales tax and all other licenses, registration, and title fees; pay for all maintenance and repairs; and indemnify the lessor against all loss" because "[a]s a practical matter, the lessee holds all incidents of ownership except bare legal title"); *Taylor Rental Corp. v. John Deere Co. (In re Noack),* 44 B.R. 172, 174 (Bankr.E.D.Wis.1984) ("If ... the proprietary interest in the property is weighted in favor of the party designated as lessee, then the document is in reality a security agreement. If, on the other hand, the balance of incidents of ownership tips toward the party designated as lessor, then the document is a true lease.").

Among the factors that courts employing the Multiple–Factor Approach find indicative of a disguised security agreement are "net lease" terms—i.e., provisions in the purported lease agreement imposing on the lessee the obligation to bear risks of loss, pay taxes, insurance, and license/registration fees ("Net Lease Provisions"). *See, e.g., HPSC, Inc. v. Wakefield (In re*

*Wakefield)*, 217 B.R. 967, 971 (Bankr. M.D.Ga.1998) (concluding that fact that "debtor bore the risk of loss or damage" and "was obligated ... to maintain insurance, and to pay all taxes" indicated that "agreement was not a true lease"); *In re Maritt*, 155 B.R. 12, 13 (Bankr.D.Idaho 1993) (holding that Net Lease Provisions in agreement, together with other factors, establish that the transaction is a sale).

The Multiple–Factor Approach has been criticized by many courts and commentators as being a flawed methodology for distinguishing a true lease from a disguised security agreement. *See, e.g., In re Aspen Impressions, Inc.*, 94 B.R. 861, 868 (Bankr.E.D.Pa.1989) (noting that Multiple–Factor Approach is, "at best, inconclusive of the issue [of true lease status] as [the factors] can all legitimately appear in true leases"); *In re Loop Hosp. P'ship*, 35 B.R. 929, 936 (Bankr.N.D.Ill.1983) ("[I]t is unfortunate that the courts have relied on these so-called incidents or burdens of ownership. The factors are basically irrelevant as they can appear in true leases, and merely add to the confusion in analyzing these cases."); White & Summers, § 30–3, at 22–23 ("There are two problems with the laundry list approach. First, some of the items on the list should not be there because they are equally consistent with a document's being a security interest or a lease.... A second problem with the laundry list is its vagueness. A list of ten factors necessarily makes it more difficult to predict how a judge will characterize the arrangement."); Cooper, 49 Ohio St. L.J. at 230 ("Rather than focusing upon any of the economic distinctions between these two transactions, the courts have developed a laundry list of factors they rely upon to find that a lease is subject to Article 9 [of the UCC]."). Further, the better reasoned decisions hold that the presence in an agreement of Net Lease Provisions does not necessarily signal a disguised security agreement. *See Marhoefer Packing*, 674 F.2d at 1146 ("Although [the debtor] was required to pay state and local taxes and the cost of repairs, this fact does not [suggest that agreement is a sale rather than true lease]. Costs such as taxes, insurance and repairs are necessarily borne by one party or the other. They reflect less the true character of the transaction than the strength of the parties' respective bargaining positions."); *Ford Motor Credit Co. v. Hoskins (In re Hoskins)*, 266 B.R. 154, 162 (Bankr. W.D.Mo.2001) ("[T]he [debtors'] obligation to insure the vehicle during the lease term, maintain and repair the vehicle and pay all license, title and registration costs does not transform the lease into security for a conditional sales contract."); *Rainier Nat'l Bank v. Inland Mach. Co.*, 29 Wash.App. 725, 631 P.2d 389, 395 (1981) ("The lessor is either going to include those costs within the rental charge or agree to a lower rent if the lessee takes responsibility for them."); White & Summers, § 30–3, at 27 ("[L]essees as well as buyer-debtors routinely bear risks of loss, pay taxes, insurance, and registration fees.... [T]he well-known 'net, net, net' leases are still leases even though the lessee bears most of the burden.").

### b. *Common Law Nominality Tests*

#### i. *Percentage Tests*

Courts applying Old § 1–201(37) developed percentage tests to determine whether the option price contained in a purported lease is nominal ("Percentage Tests"). Percentage Tests compare: (1) the option price contained in the agreement with the original purchase price of the "leased" goods; (2) the option price with the total stream of rental payments made under the contract; and (3) the original cost of the "leased" goods with the total payment

stream. *See, e.g., Orix Credit Alliance, Inc. v. Pappas,* 946 F.2d 1258, 1261–62 (7th Cir.1991) (stating that an option price that represents 12% of total rental payments, while not dispositive, indicates a secured sale rather than true lease); *Fruehauf Corp. v. Int'l Plastics, Inc. (In re Int'l Plastics, Inc.),* 18 B.R. 583, 587 (Bankr.D.Kan.1982) (holding that option amount that is 53% of cash sale price on the date agreement was executed reflected a true lease); *Equilease Corp. v. AAA Mach. Co. (In re AAA Mach. Co.),* 30 B.R. 323, 325 (Bankr.S.D.Fla.1983) (holding that option amount is nominal where it is 10% of original equipment cost). Percentage Tests (like the Multi–Factor Approach) have been characterized as an unreliable determinant of option price nominality and, ultimately, true lease status. *See, e.g., APB Online,* 259 B.R. at 818 (noting that "[Percentage Tests] are 'the crudest of proxies for the correct calculation'" (quoting White & Summers, § 30–3, at 20)); *Chase Leasing Co. v. P.W.L. Invs. (In re P.W.L. Invs.),* 92 B.R. 680, 683 (Bankr.W.D.Tex.1987) ("The percentage method makes the determination of what is nominal too subjective."); *Bayer,* 43 Bus. Law. at 1496–97 ("Some courts have missed the point, however, and have compared the option price to such things as the original cost of the property or the total rent payable during the term of the lease. While this type of analysis may indicate whether the option is nominal (in the abstract) in relation to something, the comparison may have no bearing on whether the lessee will be compelled to exercise the option and therefore become the owner." (footnote omitted)).

### ii. *The Option Price/FMV Test*

A widely utilized test for assessing the nominality of a purchase option price under Old § 1–201(37) compares the option price with the anticipated fair market value of the leased goods at the time the option will be exercised (the "Option Price/FMV Test"). *See APB Online,* 259 B.R. at 818 (stating that courts "measure nominality by comparing the option price to the ... fair market value at the time the option is exercised"); *Edison Bros. Stores,* 207 B.R. at 811 n. 12 ("In determining whether an option price is nominal, courts have ... compar[ed] ... the option price to the anticipated fair market value of the equipment at the end of the lease term."); White & Summers, § 30–3, at 14 ("[S]ome courts state that if the amount the lessee must pay to exercise his option is roughly equal to the fair market resale value of the asset at that time, then the transaction is not a secured sale. This equivalence would indicate that the lessee was not really paying installments on a price, but was instead paying a true rent (a sum for wear and tear plus reasonable profit)." (footnote omitted)).

Properly applied, the Option Price/FMV Test focuses on lease inception—i.e., courts must determine what the parties, at the outset of the transaction, anticipated the fair market value of the leased goods would be at the time the option is to be exercised. *See Orix Credit Alliance,* 946 F.2d at 1262 ("An option price may also be found to be nominal where it is insubstantial in relation to the fair market value of the leased goods at the time the option arises as anticipated by the parties when the agreement was executed."); *Marhoefer Packing,* 674 F.2d at 1144–45 ("[I]n determining whether an option price is nominal, the proper figure to compare it with is not the actual fair market value of the leased goods at the time the option arises, but their fair market value at that time as anticipated by the parties when the lease is signed."); *Edison Bros. Stores,* 207 B.R. at 811 ("The proper way to determine whether an option price is nominal is to

examine what the parties, at the inception of the transaction, anticipated the fair market value would be at option time."); *Kimco Leasing, Inc. v. State Bd. of Tax Comm'rs.*, 656 N.E.2d 1208, 1215 (Ind.Tax Ct.1995) ("[I]t is at the beginning of a lease that either a true lease or a security interest is created and the effects of appreciation, depreciation, inflation, and/or advancements in technology cannot change what was initially created as a true lease into a security interest, or vice versa."); Commentators, too, stress the importance of analyzing nominality at the time the purported lease is signed:

> Intending a true lease, parties might at the signing select an option price that they believe will equal the fair market value of the property at the end of the lease. Yet actual value at the end of the lease may be substantially higher or lower than their estimate. If the option were "nominal" at the conclusion of the lease (because the property had not depreciated as expected), but would not have been "nominal" had the parties' estimate proved true, should the agreement be regarded as a lease or a security agreement? We believe it should be a lease.
>
> Parties make their agreement at the outset. Only there do they have the common intention to create a lease or security agreement, and it is at that time we should determine their true intention. If subsequent events make the option price small in comparison with the asset's value at the end of the lease, so be it. That fact does not change what was once a true lease into a security agreement.

White & Summers, § 30–3, at 15; Cooper, 49 Ohio St. L.J. at 214 ("If one does not use the anticipated value at the time the lease with option is entered into, then a true lease is 'transubstantiated' into a disguised security interest by a rising market, and a disguised security interest becomes a true lease in a falling market." (footnote omitted)).

### iii. *The Economic Realities Test*

Yet another common law nominality test developed by courts applying Old § 1–201(37) is the so-called "Economic Realities Test." Under the Economic Realities Test,[7] "[w]here the terms of the lease and option to purchase are such that the only sensible course for the lessee at the end of the lease term is to exercise the option and become the owner of the goods, the lease was intended to create a security interest." *Steele v. Gebetsberger (In re Fashion Optical, Ltd.)*, 653 F.2d 1385, 1389 (10th Cir. 1981) (quoting *Percival Constr. Co. v. Miller & Miller Auctioneers, Inc.*, 387 F.Supp. 882, 885 (W.D.Okla.1973), *aff'd in part, rev'd in part*, 532 F.2d 166 (10th Cir. 1976)). *See also* Dicker & Campo, 7 Am. Bankr.Inst. L.Rev. at 544–45 ("[A]nother common law test used by courts deciding cases under . . . Old UCC [§ 1–201(37)] is the so-called 'economic realities test' which . . . . provides that if at the end of the lease term, the only economically sensible course for the lessee to take is to exercise the option to purchase the property, then the lease is a security agreement."). The Economic Realities Test requires an analysis of all terms and conditions of a purported lease transaction to determine whether the lessee has no sensible alternative other than to exercise the purchase option. *See, e.g., Lykes Bros. S.S. Co.*, 196 B.R. at 581–82 (finding that debtor had no sensible alternative other than to pay $44 million to

---

7. The Economic Realities Test has also been variously referred to as the "sensible person test," *see Triplex Marine*, 258 B.R. at 671, and the "No Lessee in its Right Mind Test," *see Morris v. Dealers Leasing, Inc. (In re Beckham)*, 275 B.R. 598, 603 (D.Kan.2002).

purchase leased equipment as opposed to paying $91 million in rent for an additional five years and, therefore, the purchase option was nominal); *In re Cook*, 52 B.R. 558, 563 (Bankr.D.N.D.1985) (cost of removal of "leased" irrigation equipment "really leaves [the lessee] with no choice at the end of the lease term" other than to exercise the purchase option); *Sight & Sound of Ohio, Inc. v. Wright*, 36 B.R. 885, 889–90 (S.D.Ohio 1983) ("[T]he only plausible alternative available to the lessee at the end of the ... lease agreement would be to purchase refrigerator outright ... [for] the option price of $69.75 [rather continuing to rent refrigerator at $717.50 per year]."); *In re Berge*, 32 B.R. 370, 372–73 (Bankr.W.D.Wis.1983) (noting that "if the fair market value of the property contemplated at the end of the lease term was less than the cost of reassembly and transport of the equipment to the lessor .... the exercise of the option would be virtually 'compelled' or the 'only sensible course,' and the consideration [required to exercise the option] *ipso facto* nominal"); Richard L. Barnes, *Distinguishing Sales and Leases: A Primer on the Scope and Purpose of UCC Article 2A*, 25 U. Mem. L.Rev. 873, 885 (1995) ("The option price is nominal if the sensible lessee would in effect have no choice [other than to exercise the purchase option] and, in making the only sensible choice, would cut off the lessor's reversionary interest. Where a person is left with no real economic choice, the price of taking the action must be nominal." (footnote omitted)).

The Economic Realities Test, like the Option Price/FMV Test, should focus on all the facts and circumstances surrounding the transaction as anticipated by the parties at contract inception, rather than at the time the option arises. *See Kimco Leasing*, 656 N.E.2d at 1218 ("Without information regarding the fair market value of the leased equipment at the time the

purchase option is to be exercised (*as anticipated by the parties when the lease was signed*) it is impossible to determine ... whether the only sensible decision economically for ... [the] lessees is to exercise their purchase options." (emphasis added)); Edwin E. Huddleson, III, *Old Wine in New Bottles: UCC Article 2A—Leases*, 39 Ala. L.Rev. 615, 633 (Spring 1988) ("Transactions are not true leases where the parties anticipate, at the outset of the transaction, that the option will be irresistible in the sense that the option price is extremely low in comparison to the fair market value of the property.").

## B. *The Proposed Solution—"New § 1–201(37)"*

As discussed above, the caselaw interpreting Old § 1–201(37) is not a seamless web, but rather a disjointed patchwork of decisions that simply cannot be reconciled. *See also Kim*, 232 B.R. at 329 (referring to "the profusion of inconsistent views among the courts [applying Old § 1–201(37)] regarding the proper criteria to be applied in determining whether an agreement denominated as a lease created a true lease or a security interest"); *Carlson*, 616 N.E.2d at 812 ("The vagaries inherent in § 1–201(37) have obliged the courts to resort to the 'facts of each case, ... with the effect of producing complex guidelines for adjudication which have left judicial decisions entirely unpredictable.' "). "The root of the problem under [Old § 1–201(37)] was its focus on the subjective intent of the parties." *Kim*, 232 B.R. at 329. As the official comment to the 1987 revision to UCC § 1–201(37) ("New § 1–201(37)") explains,

[r]eference to the intent of the parties to create a security interest has led to unfortunate results. In discovering intent, courts have relied upon factors that were thought to be more consistent with

sales or loans than leases. Most of these criteria however, are as applicable to true leases as to security interests. . . . Accordingly, amended Section 1–201(37) deletes all reference to the parties' intent.

Official Comment to New § 1–201(37) (West 2002).

New § 1–201(37), which was adopted by the California legislature in 1988 and made effective January 1, 1990, reads:

"Security interest" means an interest in personal property or fixtures which secures payment or performance of an obligation.

Whether a transaction creates a lease or security interest is determined by the facts of each case; however, a transaction creates a security interest if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee, and

(a) the original term of the lease is equal to or greater than the remaining economic life of the goods,

(b) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods,

(c) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement, or

(d) the lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

A transaction does not create a security interest merely because it provides that

(a) the present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or is greater than the fair market value of the goods at the time the lease is entered into,

(b) the lessee assumes risk of loss of the goods, or agrees to pay taxes, insurance, filing, recording, or registration fees, or service or maintenance costs with respect to the goods,

(c) the lessee has an option to renew the lease or to become the owner of the goods,

(d) the lessee has an option to renew the lease for a fixed rent that is equal to or greater than the reasonably predictable fair market rent for the use of the goods for the term of the renewal at the time the option is to be performed, or

(e) the lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value of the goods at the time the option is to be performed.

For purposes of this subsection (37):

(x) Additional consideration is not nominal if (i) when the option to renew the lease is granted to the lessee the rent is stated to be the fair market rent for the use of the goods for the term of the renewal determined at the time the option is to be performed, or (ii) when the option to become the owner of the goods is granted to the lessee the price is stated to be the fair market value of the goods determined at the time the option is to be performed. Additional consideration is nominal if it is less than the lessee's reasonably predictable cost of performing under the lease agreement if the option is not exercised;

(y) "Reasonably predictable" and "remaining economic life of the goods" are

to be determined with reference to the facts and circumstances at the time the transaction is entered into; and

(z) "Present value" means the amount as of a date certain of one or more sums payable in the future, discounted to the date certain. The discount is determined by the interest rate specified by the parties if the rate is not manifestly unreasonable at the time the transaction is entered into; otherwise, the discount is determined by a commercially reasonable rate that takes into account the facts and circumstances of each case at the time the transaction was entered into.[8]

■■■■ As discussed above, an essential characteristic of a lease agreement is that the lessor retains an economically meaningful residual interest in the leased property. New § 1–201(37) attempted "to reassert the significance of residual value as the touchstone of the common law definition of a true lease." Gregory J. Naples, *A Review and Analysis of the New Article 2A—Leases Amendment to the UCC and Its Impact on Secured Creditors, Equipment and Finance Lessors*, 93 Comm. L.J.

342, 349 (1988). *See also In re Allen*, 174 B.R. 293, 295 (Bankr.D.Or.1994) ("Under the new test, the touchstone for making the determination is whether the lessor retained an economically significant reversionary interest."). In analyzing whether the lessor has retained an economically meaningful residual interest in the "leased" property, courts must look to the economic effect of the purported lease agreement rather than the intent of the parties. *See PSINet*, 271 B.R. at 43–44 ("Following its amendment in 1988, UCC § 1–201(37) no longer takes into account the actual or stated intent of the parties at the time of the transaction, and instead looks solely to the terms of the agreement itself. . . . The intent of the parties at the time the agreement was entered into is irrelevant to the determination of whether a true lease has been established."); *Banterra Bank v. Subway Equip. Leasing Corp. (In re Taylor)*, 209 B.R. 482, 484 (Bankr.S.D.Ill.1997) ("In any analysis under § 1–201(37), the intent of the parties is no longer the primary consideration. Rather, the focus is on the 'economic realities' of the transaction." (citing *In re*

---

**8.** New § 1–201(37) is somewhat difficult to reference given the drafters' failure to number its first three paragraphs. *See* White & Summers, § 30–3, at 23 ("Why the persons who revised the Code in 1987, when this concatenation came into existence, thought it wise to include separate subsections with the same identifying letters, is not clear to us. It is important to read it carefully so as not to confuse the first (a) with the second and vice versa."). For ease of reference, the Court will refer to New § 1–201(37)'s first three unnumbered paragraphs as § 1–201[1], § 1–201[2], and § 1–201[3].

Some of the confusion caused by the structure of the statute may be eliminated upon the states' adoption of new UCC § 1–203. This new statute will contain those portions of UCC § 1–201(37) that distinguish true leases from security interests, except for current § 1–201(37)(z)—containing the definition of "present value"—which will be placed in

UCC § 1–201(30). Kathleen Patchel & Boris Auerbach, *The Article 1 Revision Process*, 54 SMU L.Rev. 603, 607–09 (Spring 2001); National Conference of Comm'rs on Uniform State Laws, Revision of Uniform Commercial Code Article 1—General Provisions <http://www.law.upenn. edu/611/ulc/uccl/uccl070500.htm> (accessed Sept. 28, 2002). New § 1–203 sets out five tests ((a) through (e)), four of which have numbered sub-parts. Thus, even though the section is substantively identical to New UCC § 1–201(37), the format change will make it somewhat easier to reference. To date, new UCC § 1–203 has been adopted only by the U.S. Virgin Islands. It has been introduced in the California Assembly as SB 1522. See <http://www.nccusl.org/nccusl/pubndrafts.asp> (accessed Sept. 28, 2002); and <http://www.nccusl.org/nccusl/LegByAct.pdf> (accessed Sept. 28, 2002).

*Meeks,* 210 B.R. 1007, 1009 (Bankr.S.D.Ill. 1995))); *Murray,* 191 B.R. at 314 ("[T]he focus ... under the revised statute [is] on the economics of the transaction rather than on the intent of the parties as had been the emphasis previously.").

The bankruptcy court in *In re Lerch,* 147 B.R. 455, 460 (Bankr.C.D.Ill.1992) described the structure of New § 1–201(37) in the following manner:

> The initial portion of the first sentence of the second unnumbered paragraph [of New § 1–201(37)] contains the basic direction that the [true lease versus disguised security agreement] determination is made based on the facts of each case. The latter portion of the first sentence of the second unnumbered paragraph starting with the word "however" creates an exception to the basic direction that the determination is made on the facts of each case, as it provides that without looking at all the facts, a lease will be construed as a security interest if a debtor cannot terminate the lease, and if one of the four enumerated terms is present in the lease. Absent a mandated classification, the determination is based on the facts of the case. At this point the third unnumbered paragraph comes into effect. Focusing on the economics of the transaction, it states that a security interest is not created merely because it contains any of the five terms enumerated in the third unnumbered paragraph.

*See also Owen,* 221 B.R. at 60–61 ("[I]f the Debtors do not have a right to terminate the purported lease prior to the expiration of its term, then the Court is to examine whether any of the four enumerated conditions have been met which would establish that the parties entered into a security agreement. . . .").

As the *Lerch* court notes, New § 1–201(37)[2] first requires a court to apply what has been referred to as the "Bright-Line Test." *See PSINet,* 271 B.R. at 43 (noting that New § 1–201(37)[2] implements an objective, "bright-line test"); *Owen,* 221 B.R. at 60 (stating that New § 1–201(37)[2] establishes a "bright line test"). Under this test, the initial focus is upon the lessee's obligation under the purported lease agreement. If the consideration the lessee must pay for the term of the lease is not subject to termination by the lessee, then the transaction meets the first prong of the test. *PSINet,* 271 B.R. at 44 ("The first part of the statutory test requires an inquiry as to whether or not the lease prohibits the lessee from terminating its obligation to pay the lessor the full cost of the equipment covered by the lease before the expiration of the lease term."); Dicker & Campo, 7 Am. Bankr. Inst. L.Rev. at 534 ("The first part of the two-part test set forth in New UCC § 1–201(37) requires that the obligation of the lessee to make rental payments not be terminable by the lessee during the term of the lease.").

If a determination is made that a debtor's payment obligation under a purported lease is not subject to termination, then the second prong of the test must be satisfied in order to find a security interest as a matter of law. The second part of the Bright-Line Test looks to whether any of the so-called "Residual Value Factors" is present.[9] *PSINet,* 271 B.R. at 44–45 ("The

---

9. The presence of one or more of the following Residual Value Factors set forth in New § 1–201(37)[2] establish that a non-terminable "lease" agreement is a disguised security agreement as a matter of law:

 1. First, if the original term of the lease is equal to or greater than the remaining economic life of the goods.

 2. Second, if the lessee is bound to renew the lease for the remaining economic

second part of the statutory test requires the court to determine if any one of four independent factors is present. These factors are commonly referred to as the 'residual value factors.'" (quoting Dicker & Campo, 7 Am. Bank. Inst. L.Rev. at 537)); *Wakefield,* 217 B.R. at 970 ("[I]f the lessee is bound for the entire term of the agreement and if any one of the requirements of subparagraphs (a), (b), (c), or (d) are [sic] met, then the court's inquiry ends and the transaction is deemed to have created a security interest.").

■ After determining that the Bright–Line Test has not been satisfied, an examination of all the facts and circumstances of the case must be made to determine whether the agreement in question is a true lease or disguised security agreement. *Triplex Marine,* 258 B.R. at 669 ("If a court determines that the [Bright–Line Test] does not compel a conclusion that a security interest was created *per se,* it should proceed to an examination of all the facts to determine whether the economic realities of a particular transaction create a security interest."); *Taylor,* 209 B.R. at 484–85 ("If the Court determines that the transaction is not a disguised security interest *per se,* it must then look to the specific facts of the case to determine whether the 'economics of the transaction' suggest such a result." (quoting *Lerch,* 147 B.R. at 460)). The "key issue [the Court must determine] is 'whether the lessor retains a meaningful residual interest' at the end of the lease term." *In re Bumgardner,* 183 B.R. at 224, 228 (Bankr.D.Idaho 1995) (quoting *In re Zaleha,* 159 B.R. 581, 585 (Bankr.D.Idaho 1993)); *Addison,* 41 Cal.App.4th at 1295, 49 Cal.Rptr.2d at 136

("If ... a security interest [is] not conclusively found to exist ...., the court must then resort to an examination of the facts of the case to determine whether the lessor has retained a 'meaningful residual interest' in the goods." (quoting *Zaleha,* 159 B.R. at 585)); White & Summers, § 30–3, at 30 ("Once a court concludes that a lease is not terminable and none of the conditions (a)—(d) of the [second] paragraph of 1–201(37) has been met, ... [it] must then answer whether the lessor retained a reversionary interest. If there is a meaningful reversionary interest—either an up-side right or a down-side risk—the parties have signed a lease, not a security agreement. If there is no reversionary interest, the parties have signed a security agreement, not a lease.").

## C. New § 1–201(37) Applied

### 1. The Bright–Line Test

#### a. Terminability of Debtor's Payment Obligation

■ The Lease Agreements expressly grant the Debtor a right of termination. Lease Agreements, ¶ 10. Lakin argues, however, that the Debtor has no meaningful right to terminate its payment obligations to the Lessors. Lakin points out that the Lease Agreements condition the Debtor's right of termination on its payment of all remaining contractual obligations, including all monthly installments due through the end of the lease term, plus the Option Amount, less a 7% discount factor. *Id.* In support of its argument, Lakin relies on *In re Nationwise Automotive, Inc.,* 250 B.R. 900 (Bankr.

life of the goods or to become the owner of the goods.

3. Third, if the lessee has the option to renew the lease for nominal or no additional consideration upon compliance with the lease agreement.

4. Fourth, if the lessee has an option to become the owner of the goods for nominal or no additional consideration upon compliance with the lease agreement.

UCC § 1–201(37)[2] (West 2002).

S.D.Ohio 2000) (Caldwell, J.) and *Hunter v. Snap–On Credit Corp. (In re Fox)*, 229 B.R. 160 (Bankr.N.D.Ohio 1998), cases in which the bankruptcy courts held that the debtors could not terminate their payment obligations under the agreements in question given the onerous contractual obligations that were triggered upon termination.[10] Heller maintains that *Nationwise* and *Fox* are distinguishable, asserting that the Early Termination Provision contained in the Lease Agreements is not "so onerous as to negate any meaningful right of termination." Heller Reply Memorandum (Doc. No. 141–1) at 7 (quoting *Nationwise*, 250 B.R. at 904).

The first prong of New § 1–201(37)'s Bright–Line Test focuses not on whether a lessee has a contractual right to terminate under the agreement in question, but rather on whether "the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee." UCC § 1–201(37)[2] (West 2002). The Lease Agreement requires the Debtor to pay the Lessors upon termination the present value of precisely what they would receive if QDS made all required monthly installment payments for the full contract term and then exercised the purchase option. Thus, the Debtor's *payment obligation* is not subject to termination within the meaning of New § 1–201(37)[2].

While Lakin relies on, and Heller seeks to distinguish, the *Nationwise* and *Fox* decisions, the Court need not compare and contrast the termination provisions examined in those cases with the Early Termination Provision contained in the Lease Agreements. Because the bankruptcy court in *In re Architectural Millwork of Virginia, Inc.*, 226 B.R. 551 (Bankr. W.D.Va.1998) interpreted a termination provision virtually identical to the Lease Agreements' Early Termination Provision, the Court looks to that decision, rather than *Nationwise* or *Fox*, for guidance on the issue of whether the Debtor's payment obligation is terminable. In *Architectural Millwork*, the debtor—like QDS—was required upon early termination to pay the full amount of any past due payments, the present value of any future unaccrued monthly payments, plus the present value of the purchase option amount. *Architectural Millwork*, 226 B.R. at 555 n. 3. Noting that "the … agreement requires payment to [the lessor] of the present value, upon early termination, of exactly what it would be paid upon the natural termination of the lease," the court concluded that "the condition outlined in the main body of … [New § 1–201(37)[2]] is met in that the debtor could not terminate the obligation to pay the consideration due to [the lessor] under the … agreement." *Id.* at 555. The Court concurs with *Architectural Millwork's* sound reasoning and thus concludes that the Debtor's payment obligation under the Lease Agreement is not terminable. *See also PSINet*, 271 B.R. at 44 ("[The debtor] cannot terminate its obligations pursuant to the … [a]greement without incurring an obligation to [the lessor] for the full cost of the equipment. Therefore, the first part of the statutory test is satisfied."); *Hoskins*, 266 B.R. at 160 (concluding "that a termination provision in a contract which provides that

---

**10.** In *Nationwise,* the debtor could terminate the purported lease no earlier than 24 months into the 36–month term and only if it provided three month's notice, was current on all other contractual obligations, and paid termination charges and other fees to the lessor. *Nationwise,* 250 B.R. at 904. The debtor in *Fox* became "immediately liable for the total outstanding balance remaining on the equipment lease" if it invoked its right of termination before expiration of the 48–month lease term. *Fox,* 229 B.R. at 162.

a lessee remains financially liable to the lessor after termination of the lease for payments that become due after the date the lease is terminated does not constitute 'termination' within the meaning of section 1–201(37)"). Lakin therefore has established the first element of the Bright–Line Test.

### b. *Nominality*

■ The parties agree that three of the four Residual Value Factors enumerated in New § 1–201(37)[2](a) through (d) are not applicable: the original term of the Lease Agreements is not equal to or greater than the remaining economic life of the Lathes, QDS is not required to renew the Lease Agreements for the remaining economic life of the Lathes or to become the owner of the Lathes, and QDS is not afforded the option to renew the Lease Agreements for nominal or no additional consideration. *See* UCC § 1–201(37)[2](a)—(c) (West 2002). Their dispute centers on the fourth Residual Value Factor contained in the statute and whether QDS "has the option to become the owner of the goods for nominal or no additional consideration upon compliance with the [L]ease [A]greement[s]." UCC § 1–201(37)[2](d) (West 2002).

As discussed previously, courts applying Old § 1–201(37) formulated a variety of common law tests for determining whether the option price stated in a purported lease agreement is nominal. These common law tests included Percentage Tests, the Option Price/FMV Test, and the Economic Realities Test. *See Lykes Bros. S.S. Co.,*

196 B.R. at 581. New § 1–201(37) sets forth two tests for determining whether an option price is nominal: (1) the option price is not nominal when the option to purchase is stated in the agreement to be the fair market value of the property (the "FMV Standard"); and (2) the option price is nominal if it is less than the lessee's reasonably predictable costs of performing under the lease agreement if the option is not exercised (the "Option Price/Performance Cost Test").[11] UCC § 1–201(37)(x) (West 2002). Because the Option Amount is not stated in the Lease Agreements "to be the fair market value of the goods determined at the time the option is to be performed," *id.,* the FMV Standard has no application here. Accordingly, whether the Lease Agreements should be recharacterized as disguised security agreements under the Bright–Line Test will turn on application of the Option Price/Performance Cost Test, which requires a comparison of the Option Amount with the Debtor's reasonably predictable cost of performing under the Lease Agreements if the purchase option is not exercised. Lakin, Heller, and U.S. Bancorp each apply the Option Price/Performance Cost Test in a different manner, yielding the respective results shown below.

#### i. *Lakin's Nominality Calculation*

Lakin argues that a "cost of performing" that QDS must incur if it elects not to exercise the purchase option is the lost economic value of the Lathes (the "Lost Equipment Value"). By factoring in the Lost Equipment Value, Lakin concludes

---

**11.** The Option Price/Performance Cost Test set forth in New § 1–201(37)(x) is essentially a codification (with refinements) of the Economic Realities Test. *See Taylor,* 209 B.R. at 486 (New § 1–201(37)(x) codifies "what has traditionally been referred to as the '[E]conomic [R]ealities [T]est' "); Dicker & Campo, 7 Am. Bankr.Inst. L.Rev. at 540 ("New UCC 1–201(37) provides that consideration is nominal if it is for less than the lessee's reasonably predictable cost of performing were the option not to be exercised.... This test has been described as a codification of a common law test ... known as the '[E]conomic [R]ealities' [T]est....").

that the Debtor's cost of performing under the Lease Agreements if the purchase option is not exercised exceeds the Option Amount. Lakin's calculation is set forth below:

| Option Amount | Cost of Performing | |
|---|---|---|
| $9,065 | $12,000 | Lost Equipment Value |
| | +$ 7,200[12] | Cost to Remove, Crate, and Return the Lathe to U.S. Bancorp/Marcap |
| $9,065 < | $19,200 | |

### ii. *Heller's Nominality Calculation*

Heller contends that the Lost Equipment Value should not be included as a "cost of performing" under the Lease Agreement, correctly asserting that Lakin has failed to cite any authority whatsoever for the proposition that the lost economic value of equipment returned to the lessor should be deemed a cost of performance under New § 1–201(37)(x). According to Heller, including the economic value a lessee opts to forego when it returns leased equipment as a "cost of performing" under New § 1–201(37)(x) "would make even the most obvious true lease a security agreement." Heller Reply Memorandum at 8. Heller applies the Option Price/Performance Cost Test as follows:

| Option Amount | Cost of Performing | |
|---|---|---|
| $9,065 | $7,200 | Cost to Remove, Crate, and Return the Lathe to U.S. Bancorp/Marcap |
| $9,065 > | $7,200 | |

### iii. *U.S. Bancorp's Nominality Calculation*

Notwithstanding Lakin's failure to cite authority supporting its proposed methodology for applying the Option Price/Performance Cost Test, U.S. Bancorp nonetheless inexplicably concedes that the Lost Equipment Value should be factored into the statutory equation. U.S. Bancorp submits, however, that the $9,065 Option Amount should be deducted from the $12,000 Lost Equipment Value since QDS would not have to pay the Option Amount if it elected to return the U.S. Bancorp Lathe. U.S. Bancorp's nominality calculation is as follows:

| Option Amount | Cost of Performing | |
|---|---|---|
| $9,065 | $2,935 | Lost Equipment Value ($12,000 stipulated residual value of the U.S. Bancorp Lathe less the $9,065 Option Amount) |
| | +$1,500–$2,500 | Cost to Ship to Local Storage Facility |
| $9,065 > | $4,435–$5,435 | (plus $100 per month local storage charges) |

But under the foregoing methodology, if the full costs of shipping the U.S. Bancorp Lathe back to Portland, Oregon is included in the statutory calculation—which the Court believes is appropriate given the Debtor's contractual obligation to return the U.S. Bancorp Lathe to the U.S. Bancorp facility—then, as shown below, the Option Amount would be deemed nominal under U.S. Bancorp's methodology:

| Option Amount | Cost of Performing | |
|---|---|---|
| $9,065 | $ 2,935 | Lost Equipment Value |
| | +$ 7,200 | Cost to Remove, Crate, and Return the Lathe to U.S. Bancorp/Marcap |
| $9,065 < | $10,135 | |

The parties' respective nominality calculations reflect their disagreement on a fun-

---

**12.** The First and Second Stipulations establish that the cost of removal and return of each Lathe could be as low as $1,500 to $2,500 if U.S. Bancorp or Marcap elected to have the Debtor ship the Lathe to a local facility for storage until resale. U.S. Bancorp suggests that this is its customary practice, rather than requiring return of leased equipment to U.S. Bancorp's facility in Portland, Oregon. U.S. Bancorp Reply Brief at 6. Yet, because U.S. Bancorp has the contractual right to require QDS to ship the U.S. Bancorp Lathe to Portland, Oregon, the Court concludes that the full $7,200 cost of removing, crating, and shipping the Lathe back to U.S. Bancorp is the appropriate figure to be used in applying the Option Price/Performance Cost Test.

damental question: whether, and how, the Lost Equipment Value should be factored into the Option Price/Performance Cost Test. This dispute raises an issue of statutory construction, namely whether the economic value of "leased" goods, which a lessee chooses to forego when it elects not to exercise a purchase option, constitutes a "cost of performing under the lease agreement" within the meaning of New § 1–201(37). As explained below, given the state of the evidentiary record, the Court need not resolve this question of statutory interpretation.

New § 1–201(37)(y) expressly states that a lessee's reasonably predictable cost of performing under a lease agreement is "to be determined with reference to the facts and circumstances at the time a transaction is entered into." UCC § 1–201(37)(y) (West 2002). Here, the parties have stipulated that the cost of returning each Lathe to either Intech (in Los Angeles) or U.S. Bancorp (in Portland, Oregon)[13] would not exceed $7,200, including insurance. But this figure was not the sum projected by the original parties to the transaction—QDS and Intech—at the inception of the Lease Agreements. Put differently, the record does not allow the Court to determine—by referring "to the facts and circumstances at the time [the Lease Agreements were] entered into"— what the Debtor's reasonably predictable cost of performing would be if it chose not to exercise its purchase option. The parties also stipulated as to (1) the fair market value of the Lathes at the end of the term of the Lease Agreements, and (2) the expected remaining economic life of the Lathes upon contract termination. Yet no

evidence was offered to establish what, if any, projections were made by QDS and Intech at lease inception as to the Lathes' fair market value and remaining economic life upon lease termination. In place of this critical information, Lakin, Heller, U.S. Bancorp., and Marcap have offered their estimates of the fair market value and remaining economic life of the Lathes, as well as the cost to return them to the Lessors, made nearly a year after the Lease Agreements were executed. The record therefore contains no evidence establishing what the original parties to the transaction anticipated at contract inception concerning QDS's "cost of performing under the [L]ease [A]greement[s] if the option is not exercised."[14] UCC § 1–201(37)(x) (West 2002). Without this evidence, the Court is unable to make the statutory calculation required under New § 1–201(37)'s Option Price/Performance Cost Test. *See APB Online,* 259 B.R. at 819–20 (declining to consider affidavit testimony because affiant did not "participate[ ] in the lease transactions or the computation of the option prices" and holding that the "record is insufficient to permit [the court] to conclude ... that the ... option price was or was not nominal"); *Edison Bros. Stores,* 207 B.R. at 811–12 (holding that debtor failed to meet its burden of proving lease should be recharacterized as a disguised security agreement because "[t]he record before [the court] provides no credible evidence as to the projected fair market of the [leased equipment] on the dates the Debtor will be entitled to exercise the purchase options"); *Zaleha,* 159 B.R. at 585–86 ("Debtor's evidence addresses only the value of the

---

13. No evidence was presented establishing Marcap's place of business.

14. After receiving and reviewing the parties' stipulations, the Court informed counsel that the stipulations do not contain the evidence necessary for the Court to assess nominality under New § 1–201(37)'s statutory test. Although the Court afforded the parties an opportunity to amend the stipulations or supplement the record, they did not do so.

[equipment] as calculated from the present date, nearly 2½ years after the option price was set. This is not the proper point to determine whether the option price was set low in order to force the debtor to buy the [equipment].”); *Kimco Leasing*, 656 N.E.2d at 1215 (holding that court cannot make a finding of nominality “[w]ithout some concrete information regarding the *anticipated* fair market value of the leased equipment at the time the purchase option is to be exercised” (emphasis added)). Because it did not present the Court with the evidence needed to apply the Option Price/Performance Cost Test, Lakin has failed to demonstrate the nominality of the

Option Amount under the Bright–Line Test.[15]

 Lakin urges the Court to apply the Percentage Tests, arguing that they demonstrate the Option Amount’s nominality because: (1) the Option Amount ($9065) represents only 10% of the original purchase price of each Lathe ($90,650); (2) the Option Amount equals only 8.2% of the total stream of payments the Lessors are to receive from QDS under the Lease Agreements; and (3) the total payment stream to be received by the Lessors exceeds the original cost of the Lathes by 21.8%. Heller disputes this final point, noting that if the payment stream the Lessors

---

**15.** As noted above, given the evidentiary deficiencies in the record, the Court need not decide whether, under New § 1–201(37)(x), the Lost Equipment Value should be counted as a “cost of performing under the [L]ease [A]greement[s] if the purchase option is not exercised.” UCC § 1–201(37)(x) (West 2002). The Court concurs, however, with Heller’s point that inclusion of foregone economic value as a performance cost in the application of the Option Price/Performance Cost Test would have the effect of converting “the most obvious true lease [into] a security agreement.” Heller Reply Memorandum at 8. For example, assume the following hypothetical facts: Lessor and lessee execute a three-year rental agreement under which the lessee obtains the use of equipment having an original cost of $100,000. The equipment has a projected economic life of six years from lease inception. The agreement calls for the lessee to make monthly payments of $1700 per month for 36 months (a stream of payments totaling $61,200) and grants the lessee an option to purchase the equipment at the end of the lease term for $50,000. The parties project that the equipment’s fair market value of the equipment at the end of the 36–month lease term will approximate the $50,000 option amount. Under the agreement, if the lessee chooses not to exercise the purchase option, then it is obligated to pay the lessor $5,000 to defray its cost to have the equipment deinstalled and shipped to the lessor’s place of business. An option price of $50,000, which is one-half of the equipment’s original cost and approximates its fair market

value at option time, clearly would not be nominal. Yet if the lost economic value of the equipment is included as a performance cost under the Option Price/Performance Cost Test, as Lakin urges the Court to do here, then the $50,000 option price would be found to be nominal, as the following calculation demonstrates:

| Option Amount | | Cost of Performing |
|---|---|---|
| $50,000 | $50,000 | Lost Equipment Value |
| | + $ 5,000 | Cost to Deinstall and Return the Equipment |
| $50,000 < | $55,000 | |

Thus, interpreting New § 1–201(37)(x)’s phrase “cost of performing under the lease agreement if the purchase option is not exercised” broadly so as to include the economic value a lessee chooses to forego when it declines to exercise a purchase option would produce absurd results. *See Burkhart v. U.S. Commerce Equip. Fin., LLC*, No. E2001–00069–COA–R3–CV, 2001 WL 984915, at *5 (Tenn.Ct.App. Aug.28, 2001) (declining to adopt “method of calculating [lessee’s] ‘reasonably predictable cost of performing under the lease agreement if the option is not exercised’ ” that would result in “just about any lease . . . be[ing] classified as a secured transaction”). *See generally Dewsnup v. Timm*, 502 U.S. 410, 427, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992) (Scalia, J., dissenting) (“If possible, [courts] should avoid construing the statute in a way that produces . . . absurd results.”).

are to receive is discounted to present value, then the Debtor's total payments under the Lease Agreements barely exceed the original cost of the Lathes. Because the Court declines to measure the nominality of the Option Amount by resorting to the Percentage Tests, it need not determine which of the competing calculations is correct.

As previously discussed, several different common law tests for assessing the nominality of the option price stated in a purported lease agreement emerged from the caselaw interpreting Old § 1–201(37). The drafters of New § 1–201(37) incorporated two distinct nominality tests into the amended statute: the FMV Standard and the Option Price/Performance Cost Test. If the drafters of New § 1–201(37) had intended for nominality to be measured by the Percentage Tests, then they presumably would have incorporated these standards (or some variation thereof) into the current version of the statute. Thus, it would not be appropriate to measure nominality using a common law test that the drafters of New § 1–201(37) opted not to include in the statute. *See Charles,* 278 B.R. at 224 (holding that, because "the enactment of [N]ew § 1–201(37) 'disavows percentage tests,'" authorities applying the Percentage Tests "have been superceded by [New § 1–201(37)'s] enactment" (quoting White & Summers, § 30–3, at

20)); *Beckham,* 275 B.R. at 604 (concluding that Tenth Circuit authority endorsing a bright-line rule that option prices of less than 25% of the original equipment cost are per se nominal "has been superceded by the amendments to [§ 1–201(37)]"); Huddleson, 39 Ala. L.Rev. at 629–31 (noting that the drafters of New § 1–201(37) "considered and rejected" a variety of "formulas and percentages to define an option in a true lease"). Indeed, New § 1–201(37)[3](a) expressly rejects at least one of the Percentage Tests, stating that

[a] transaction does not create a security interest merely because it provides that ... the present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or is greater than the fair market value of the goods at the time the lease is entered into.

UCC § 1–201(37)[3](a) (West 2002). Moreover, even if the Percentage Tests had survived the enactment of New § 1–201(37),[16] courts and commentators have pointed out that such tests are not a reliable indicator of nominality. *See APB Online,* 259 B.R. at 818 (rejecting Percentage Tests because they are "the crudest proxies for the correct calculation'" (quoting White & Summers, § 30–3, at 20)); Huddleson, 39 Ala. L.Rev. at 637 (stating that "to seek mathematically precise percent-

---

**16.** Notwithstanding the enactment of New § 1–201(37), some courts continue to apply the Percentage Tests to determine whether the option price contained in a purported lease agreement is nominal. *See, e.g., Triplex Marine,* 258 B.R. at 670 (option price representing 10% of the original purchase price of the leased goods and 5% of aggregate rental payments made by the debtor held to be nominal); *In re Super Feeders, Inc.,* 236 B.R. 267, 270–71 (Bankr.D.Neb.1999) (option price that is 5% of original property cost and 3.6% of total rental payments found to be nominal); *Wakefield,* 217 B.R. at 971 (holding that op-

tion prices contained in two purported lease agreements are nominal where they constitute 10% of original equipment cost and total payments exceed the initial cost of the equipment "under Agreement 1 ... by approximately 50% .... [and] under Agreement 2 ... by approximately 29%"). *See generally* Dicker & Compo, 7 Am. Bankr.Inst. L.Rev. at 518 (noting that "[w]hile the statute sets forth two tests for determining whether consideration is nominal, courts [continue to] look to several common law tests to assist them in making their decisions").

ages or formulas to define an impossibly low option price" is a "vain quest for illusory benefits").

 Heller and U.S. Bancorp also suggest that the Court should apply the Option Price/FMV Test to determine whether the Option Amount is nominal. As explained above, this test requires a comparison of the option price and the fair market value of the leased goods at the time the option is to be exercised—as anticipated by the parties at lease inception. Heller argues that Lakin cannot demonstrate nominality under this standard because it failed to offer "evidence of what the parties would have expected the Lathes to be worth when the Lease Agreements expired, at the time they signed the

Lease[s]." Heller Reply Memorandum at 11.[17] While this statement is correct, and the Option Price/FMV Test was widely accepted as an accurate measure of nominality under Old § 1–201(37),[18] the Court again declines to employ a common law test that the drafters of New § 1–201(37) did not see fit to include in the amended statute.

#### c. *Retention of a Meaningful Reversionary Interest*

 Having concluded that the Lease Agreements are not terminable and that none of the conditions set forth in New § 1–201(37)[2](a) through (d) have been met, the Court must address the outcome-determinative question: Did the Lessors

---

17. U.S. Bancorp seems to have missed this point altogether. As discussed above, in distinguishing a true lease from a disguised security agreement, it is well-settled that courts must look to lease inception (*see* caselaw and commentary discussed *supra* at 338–40). It is at that point in time that either a true lease or a security agreement is created. Thus, it is the parties' projections at the outset of a transaction—of the expected fair market value of the leased goods, their remaining economic life, if any, at lease end, and the cost of continued performance under the lease agreement if the option is not exercised—that must be examined in determining whether an agreement is or is not a true lease. Despite the wealth of authority supporting the proposition that lease inception, rather than some later date, must be the Court's focal point, the parties have presented stipulations that do not focus on lease inception and therefore do not contain the information necessary to determine whether the Lease Agreements are true leases or disguised security agreements. In view of the fact that Lakin bears the burden of proving that the Lease Agreements are other than what they purport to be, it is difficult to understand why U.S. Bancorp, Heller, and Marcap agreed to the submission of the stipulations in the first instance. Had they simply put Lakin to its proof—requiring it to come forward at a hearing with evidence establishing what the parties to the Lease Agreements projected at the outset of the transaction as to

the Lathes' residual value, remaining economic life at lease end, etc.—this dispute may well have been avoided.

18. Both courts applying Old § 1–201(37) and legal commentators have described the Option Price/FMV Test as perhaps the most accurate common law standard for assessing the nominality of the option price stated in a purported lease agreement. *See, e.g., Edison Bros. Stores*, 207 B.R. at 811 (applying Old § 1–201(37) and noting that "[t]he proper way to determine whether the option price is nominal is to examine what the parties, at the inception of the transaction, anticipated the fair market value would be at option time."); Cooper, 49 Ohio St. L.J. at 227 ("The only test that focuses on the true nature of the transaction is the … test … which looks to the relationship between the option price and the residual value of the goods when the option is exercised."). Several courts have continued to apply the Option Price/FMV Test as a nominality standard even after the adoption of New § 1–201(37). *See, e.g., Kimco Leasing*, 656 N.E.2d at 1214 ("[A] lease creates a security interest as a matter of law if the purchase option price stated in the lease is nominal in relation to the fair market value of the property at the time the purchase option is to be exercised."); *Zaleha*, 159 B.R. at 586 (utilizing the Option Price/FMV Test to gauge the nominality of the option price).

retain a meaningful reversionary interest in the Lathes? *See Triplex Marine*, 258 B.R. at 671; *Addison*, 41 Cal.App.4th at 1296, 49 Cal.Rptr.2d at 136. Unfortunately, while New § 1–201(37) sends a court on a search for the lessor's residual interest, it provides no path markers to guide the way. *See* White & Summers, § 30–3, at 16 ("[T]he drafters of [New] § 1–201(37) failed to focus on the existence of a reversionary interest. Rather than state a bold and explicit definition based on the reversionary interest, the drafters offered a list of factors that should or should not support an inference of lease."); Barnes, 25 U. Mem. L.Rev. at 891 ("[W]e can expect to see ... continuing struggles in the courts over the lease/sale distinction. Despite the more rounded economic test, courts do not have a complete test for making the distinction."). The statute simply states that the determination of lease versus security agreement status should be based on "the facts of each case" and then enumerates five conditions (in New § 1–201(37)[3]) that are not sufficient, standing alone, to establish the existence of a disguised security interest. *Lerch*, 147 B.R. at 460 ("Absent a mandated classification, the determination is based on the facts of the case. At this point, the third unnumbered paragraph [of New § 1–201(37)] comes into effect.").[19]

By failing to include an explicit test for assessing whether a lessor has retained a meaningful reversionary interest, the drafters of New § 1–201(37) have created the same confusion and unpredictability in the caselaw that existed under Old § 1–201(37). *See* Gaines, 18 Stetson L.Rev. at 83 ("Simply put, this is a poorly drafted Code provision purporting to clarify one of the most litigated and convoluted areas of the law relating to lease transactions. The language employed in subsection 1–201(37)(x) results in a definitional nightmare both for those attempting to structure a lease transaction and those subsequently called upon to interpret it."); Barnes, 25 U. Mem. L.Rev. at 891 ("The new version of section 1–201(37) even encourages the continued development of a judicial gloss on the test."); Bayer, 43 Bus. Law. at 1498 ("Despite the improvements, the revisions to section 1–201(37) fall far short of creating a bright line test for determining whether a transaction creates a lease or a security interest."); Dawley, 24 J. Corp. L. at 169 ("Although the revised section 1–201(37) was intended to clarify the lease versus security interest issue, this issue continues to be one of the most litigated under the U.C.C."); James J. White & Robert S. Summers, Uniform Commercial Code, vol. 4, § 30–3, at 24 (4th ed., West 1995) ("The drafters of revised 1–201(37) claim to have provided a test

---

19. New § 1–201(37)[3] provides that a transaction does not create a security interest merely because one or more of the following five conditions exist:

1. That the present value of the consideration the lessee is obligated to pay the lessor is substantially equal to or greater than the fair market value of the goods at the time the lease is entered into;
2. That the lessee assumes the risk of loss of the goods, or undertakes the obligation to pay taxes, insurance, filing, recording or registration fees or service or maintenance costs;
3. That the lessee has an option to renew the lease or become the owner of the leased goods;
4. That the lessee has an option to renew the lease for a fixed rent that is equal to or greater than the reasonably predictable fair market rent for the use of the goods for the term of the renewal at the time the option is to be performed; or
5. That the lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value of the goods at the time that the option is to be performed.
UCC § 1–201(37)[2](a)(e) (West 2002).

that draws a bright line between leases and security agreements. The new line is brighter than the old, but we think the drafters are a little too optimistic."). Indeed, there seem to be nearly as many different approaches to determining the existence of a meaningful residual interest as there are reported decisions. *See, e.g., In re Copeland,* 238 B.R. 801, 804–05 (Bankr.E.D.Ark.1999) (analyzing the issue of whether the lessor retained a meaningful reversionary interest by considering a hodgepodge of factors, including whether the agreement includes Net Lease Provisions and whether the present value of the aggregate rental payments exceeds the original equipment cost—i.e., factors that, according to New § 1–201(37)[3], are consistent with true lease status); *Owen,* 221 B.R. at 61 (concluding that Bright–Line Test did not establish a per se security agreement and then applying the following criteria in its reversionary interest analysis: (1) whether the option price is nominal; (2) whether the present value of the rental payments exceeds the original cost of the leased property; and (3) whether the lease term covers the total useful life of the equipment); *Taylor,* 209 B.R. at 487 (determining existence of significant reversionary interest by applying a mix of the Residual Value Factors contained in New § 1–201(37)[2] and the factors set forth in New § 1–201(37)[3](a), (b), and (c)); *Murray,* 191 B.R. at 316 (holding that factors cited by the debtor—including the fact that present value of total rental payments exceeds the equipment's cost and the agreement contains Net Lease Provisions—do not establish that the lessor relinquished its reversionary interest); *Howell,* 161 B.R. at 289–90 (determining that Bright–Line Test was not determinative, applying Multi–Factor Approach, and relying on the presence of Net Lease Provisions to support its finding of a disguised security agreement).

The above-cited cases reflect the marked lack of uniformity in the reported decisions as to the appropriate test for determining the existence of a meaningful reversionary interest. But it is not for the Court to attempt to harmonize these discordant lines of authority or select what it deems to be the most salient decisional criteria. Since California law governs, the Court follows the sound reversionary interest analysis found in *Addison.*

*Addison* involved a purported lease of a Ferrari 330GTC roadster having an original value of $244,800. At the trial court level, the defendant lessee moved to dismiss the action brought by the lessor's assignee for breach of the lease, asserting that the plaintiff was not entitled to recover his deficiency following the vehicle's sale at auction due to his noncompliance with UCC § 9–504's foreclosure sale provisions. The trial court denied the motion and, at the conclusion of the jury trial, the jury found the defendant liable under the lease. The *Addison* court affirmed the lower court's decision, concluding that the agreement was a true lease and thus UCC § 9–504 did not apply. The court began its analysis by determining that the Bright–Line Test failed to establish a per se security agreement since none of the Residual Value Factors were present. *Addison,* 41 Cal.App.4th at 1296, 49 Cal. Rptr.2d at 137. Turning to the question of whether the lessor retained a meaningful reversionary interest in the Ferrari, the court analyzed two factors: (1) whether the purchase option price is nominal; and (2) whether the agreement contains any provision for the lessee's acquisition of equity in the vehicle. *Id.* In what one leading authority characterized as "the world's easiest determination of non-nominality," *see* White & Summers, § 30–3, at 31, the *Addison* court simply confirmed the trial court's finding that an option price of

$255,809.78 was not nominal. *Id.* at 1297, 49 Cal.Rptr.2d at 137. The court then rejected the lessee's contention that the lease granted him an equity interest in the Ferrari because its termination provision required him "to bear the risk of gain or loss in value upon the termination of the lease." *Id.* Because the lease did not provide for a permanent transfer of ownership of the vehicle to the lessee upon default, but merely shifted the risk of gain or loss upon its disposition to the defendant, the *Addison* court concluded that the agreement did not grant the lessee an "an equitable ownership interest" in the Ferrari. *Id.* at 1297–98, 49 Cal.Rptr.2d at 137–38. Other courts, too, have utilized the two-part reversionary interest test applied in *Addison*, which focuses on the nominality of the option price and whether the purported lease grants the lessor an equity interest in the leased goods.[20] *See, e.g.,*

*Bumgardner*, 183 B.R. at 228; *Zaleha*, 159 B.R. at 585; *Kimco*, 656 N.E.2d at 1218.

Application of *Addison's* decisional framework here leads to the inescapable conclusion that the Lessors retained a meaningful reversionary interest in the Lathes. The Court has determined—in the context of applying the Bright–Line Test—that Lakin failed to meet its burden of demonstrating that the Option Amount is nominal.[21] Thus, the first element of *Addison's* two-prong test has not been established. And Lakin does not allege, nor do the Lease Agreements establish, that QDS acquired an equity interest in the Lathes. Hence, under test adopted by the *Addison* court, Lakin has not met its burden of proving that the Lessors failed to retain a meaningful reversionary interest in the Lathes.

According to Lakin, the Lessors relinquished their reversionary interest in the Lathes because, given the economics of the

20. Since California law controls, in determining whether the Lessors have retained a meaningful reversionary interest in the Lathes, the Court has followed the approach outlined in *Addison*. *Addison's* reversionary interest analysis, however, does seem to be logically flawed in one respect. Applying the Bright–Line Test, the *Addison* court made a threshold determination that the option price was not nominal and thus failed to find as a matter of law that the purported lease created a security interest. Having made this determination, it seems somewhat redundant and incongruous for the *Addison* court to have then considered the nominality of the option price a second time in connection with its reversionary interest analysis. Put differently, once a court has applied the Option Price/Performance Cost Test and concluded that the option price stated in a non-terminable "lease" agreement is not nominal, it appears to be unnecessary to revisit the issue of nominality in analyzing whether the lessor has retained a meaningful reversionary interest. And it seems particularly inappropriate to reexamine nominality using a common law nominality standard, as the courts did in the decisions cited with approval by the *Addison*

court. *See Zaleha*, 159 B.R. at 586 (applying the Option Price/FMV Test in connection with its reversionary interest analysis).

21. The *Addison* court also noted that:

The remaining terms of this document support its construction as a true lease. Paragraph 13 expressly states that the vehicle is "the sole property of Lessor, and Lessee shall have no right, title or interest therein as to the ownership thereof ... and this instrument is a lease and not a contract of sale."

*Addison*, 41 Cal.App.4th at 1299, 49 Cal. Rptr.2d at 139. Although the Lease Agreements contain similar recitations, the Court places no weight on the Debtor's acknowledgment or the form of the documents. *See Triplex Marine*, 258 B.R. at 666 ("[T]his court is not bound by any 'acknowledgment' by the Debtor nor by any other language or designation of the parties contained in the agreement."); *Owen*, 221 B.R. at 62 ("[T]he labeling of the Agreement as a 'lease' and referring to the parties as 'lessor' and 'lessee' in and of themselves are not controlling."); *Zaleha*, 159 B.R. at 586 ("[L]abels used by the parties are not determinative of the situation.").

transactions, they could not have reasonably expected to receive back anything of value from QDS at lease end. Lakin asserts that, in view of the $7200 cost to return each of the Lathes to the Lessors and the Lathes' remaining one to two-year economic life at lease end, the Debtor's only sensible alternative was to pay the $9065 Option Amount in order to retain the equipment. This argument would have more persuasive force if Lakin had produced evidence showing the projections of residual value, return shipping costs, and the Lathes' estimated remaining economic life at lease end, made by the original parties at lease inception (if such projections exist).[22] The Court has previously explained why the information contained in the stipulations is not an acceptable substitute for this evidence. Lakin's argument therefore fails on an evidentiary level. Moreover, Lakin's argument—that the Court should essentially apply a common law nominality test, i.e., the Economic Realities Test—in the context of its reversionary interest analysis is also conceptually flawed. As previously noted, the Option Price/Performance Cost Test contained in New § 1–201(37)(x) is simply a codification (and refinement) of the Economic Realities Test. Having applied New § 1–201(37)(x)'s statutory standard to assess the Option Amount's nominality under the Bright–Line Test, it makes no sense for the Court later to apply the common law version of the test in connection with its reversionary interest analysis. Such an approach certainly would not be consonant with the methodology followed by the *Addison*

court to determine the existence of a meaningful reversionary interest.

Lakin's remaining arguments are equally unavailing. It simply does not follow from the Lease Agreement's inclusion of Net Lease Provisions that the Lessors relinquished their residual interest in the Lathes. This argument is refuted by the statutory text, *see* UCC § 1–201(37)[3](b) (West 2002), and ample case authority *see, e.g., Addison*, 41 Cal.App.4th at 1299, 49 Cal.Rptr.2d at 139 ("The remaining factors [defendant] cites to support a characterization as a security agreement—his payment of sales tax, insurance, licensing and registration fees, as well as his assumption of the risk of loss or damage—are no longer considered controlling."). Lakin also maintains that a security agreement is indicated by the fact that the Lathes were obtained from a third-party supplier (or, stated differently, that Intech and the Lessors are financiers, rather than equipment manufacturers) and the Debtor was required to make a large up-front payment under the Lease Agreements. These factors—selectively plucked from the laundry lists developed by courts employing the Multiple–Factor Approach—do not support a finding that the Lessors did not retain a meaningful reversionary interest in the Lathes. *See., e.g., Edison Bros. Stores*, 207 B.R. at 821 ("[T]he fact that the role of the lessor is that of a financier is inconclusive to show that a disguised secured transaction was intended because this kind of three party transaction is typical in true lease[s] as well as in installment

---

**22.** Since Marcap and U.S. Bancorp took assignments of the Lease Agreements six and eight days, respectively, after they were signed, it is logical to infer that the assignments were contemplated at the time QDS and Intech executed the Lease Agreements. Thus, if Marcap and/or U.S. Bancorp made projections—at or about the time they took the assignments—of the Lathes' anticipated

fair market value at the time the options would arise, their remaining economic life, if any, at option time, and the Debtor's cost to return the Lathes if it elected not to exercise its purchase option, such information would have been relevant to the Court's nominality analysis. No such information was supplied by the parties (and may not exist).

sales."); *Moore v. Emery (In re American Steel Product, Inc.),* 203 B.R. 504, 510 (Bankr.S.D.Ga.1996) ("The fact that [the lessor] purchased equipment designated by [the debtor] for the sole purpose of leasing [the property] back to [the lessor] does not alone convert the lease to a security agreement; nor does it establish a lease."). *See generally APB Online,* 259 B.R. at 823 ("[N]ew § 1–201(37) eschews the laundry list of factors relied on in cases like *Brookside*"); White & Summers, § 30–3, at 19 ("[R]evised 1–201(37) rejects the laundry list approach."). Lakin also makes much of the fact that U.S. Bancorp obtained Heller's agreement to subordinate its interest in the U.S. Bancorp Lathe to the security interest U.S. Bancorp was granted under the Lease Agreement. But this also fails to demonstrate that U.S. Bancorp surrendered its reversionary interest in the U.S. Bancorp Lathe. Filing of a financing statement by a lessor is not determinative of true lease

status. *See, e.g., Owen,* 221 B.R. at 62 ("The fact that [the lessor] filed financing statements ... [does not establish a disguised security agreement]. Rather, ... the filing of the financing statement was the result of an abundance of caution to assure that [the lessor's] rights were protected."). If the filing of a financing statement by a cautious lessor does not destroy true lease status, then it stands to reason that the ultra-cautious lessor, who takes the additional step of obtaining a subordination agreement from the lessee's senior secured lender, has not thereby admitted that it has entered into a disguised financing arrangement.

In sum, Lakin has not established that the Lessors parted with their reversionary interest in the Lathes. Lakin therefore has failed to meet its burden of proving that the Lease Agreements are in fact disguised security agreements.[23]

23. Given its ruling on the merits, the Court need not dwell at length on U.S. Bancorp's procedural arguments. According to U.S. Bancorp, it was denied the opportunity to fully protect its rights because it was not notified prior to the Sale Hearing—by either the Debtor or Lakin—that Lakin would take the position that the Lease Agreements were in fact disguised security agreements. According to U.S. Bancorp, if it had known that Lakin would challenge its status as a true lessor, then it would have objected to the Asset Sale. To be sure, U.S. Bancorp should have been provided with notice of Lakin's intentions prior to the Sale Hearing. But notwithstanding its failure to receive prior notice of Lakin's position, U.S. Bancorp clearly has had a full and fair opportunity to litigate the issue of whether the Lease Agreements are true leases or disguised security agreements. Under well-settled Sixth Circuit authority, in order for a debtor to gain the approval of the sale of substantially all of its assets outside the ordinary course of business, it must establish a sound business justification for the sale. *Stephens Indus., Inc. v. McClung,* 789 F.2d 386, 389–90 (6th Cir.1986). Ample evidence was presented at the Sale Hearing to establish

a compelling business justification for the Asset Sale. U.S. Bancorp thus could not have blocked the Asset Sale simply because the status of its agreement with Debtor was in doubt as of the date of the Sale Hearing. The suggestion that U.S. Bancorp was prejudiced because the Asset Sale was approved before the true lease/disguised security interest issue was litigated is therefore utterly devoid of merit.

U.S. Bancorp's second procedural argument—that Lakin should have been required to commence an adversary proceeding or an "independent contested matter" to seek recharacterization of the Lease Agreements (*see* U.S. Bancorp Reply Brief at 6)—is equally specious. U.S. Bancorp fails to cite a single authority to support this proposition. And even a modest investment in legal research would have revealed that the lease versus disguised security interest dispute is frequently litigated outside the context of an adversary proceeding or an "independent contested matter." *See, e.g., APB Online,* 259 B.R. at 815 (Chapter 11 debtor and creditors' committee challenged true lease status by opposing lessor's motion for allowance and payment of administrative expense claim);

### V. *Conclusion*

Based on the foregoing, the Court concludes that the Lease Agreements are true leases rather than disguised security agreements. An order granting the U.S. Bancorp Motion, the Rejection Motion, and the Marcap Motion will be entered separately.

IT IS SO ORDERED.

*Triplex Marine,* 258 B.R. at 663–64 (trustee challenged true lease status by opposing equipment lessor's motion for relief from stay); *Kim,* 232 B.R. at 325 (same); *Copeland,* 238 B.R. at 802 (true lease versus disguised security interest dispute litigated in context of contested Chapter 13 confirmation proceeding); *Edison Bros. Stores,* 207 B.R. at 804 (true lease status challenged by Chapter 11 debtor in response to equipment lessor's motion for an order requiring assumption or rejection of the purported lease agreement).